No. 2--07--0938      Filed:  11-4-08

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| PIERINO DeROSE, | ) | Appeal from the Circuit Court |
| | ) | of Lake County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 06--MR--436 |
| | ) | |
| THE CITY OF HIGHLAND PARK, | ) | Honorable |
| | ) | Raymond J. McKoski, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE O'MALLEY delivered the opinion of the court:

Defendant, the City of Highland Park, appeals the trial court's judgment in favor of plaintiff, Pierino DeRose, on plaintiff's complaint seeking benefits from defendant under the Public Safety Employee Benefits Act (Employee Benefits Act) (820 ILCS 320/1 et seq. (West 2000)), which entitles certain public employees in certain situations to recover their health care premiums from their employers.  On appeal, defendant argues that plaintiff was not responding to an "emergency" (as that term is used in the Employee Benefits Act) when he was injured and is therefore ineligible for benefits under the Employee Benefits Act.  For the reasons that follow, we affirm the judgment of the trial court.

At the bench trial on this action, plaintiff testified that, on the night of September 21, 2001, he was employed as a patrolman for the Highland Park police department, a position he had held for eight years.  Plaintiff recalled receiving a call regarding a residential burglary alarm that had been

triggered. Plaintiff acknowledged the call and "got there as quickly as [he could] and in a safe manner"; he testified that he did not activate the siren or the overhead lights on his police car because doing so might have alerted any intruders in the residence he was approaching. Plaintiff testified that the weather was rainy or "pretty much of a thunderstorm," and that there was very little lighting, when he parked his police car in the driveway in front of the residence. Plaintiff stated that, normally, two officers would respond to the type of alarm he was investigating, but he addressed the situation alone because the police department was understaffed that night. He recalled that he "surveilled the front of the house" while holding a flashlight before going around the side of the house, near the garage, to "see if [he] could hear anything." Plaintiff then "proceeded *** to the back" to check if anyone was behind the house and to check for open doors or broken windows. When he reached the back of the house, plaintiff noticed "a wood deck that had a couple steps going up that led to" a sliding glass door. Plaintiff approached the sliding glass door, "looking for any movement in the house," and, as he approached, he slipped, fell, and sustained an injury to his shoulder. Plaintiff continued his investigation and determined that the alarm had been a false alarm. Plaintiff testified that he did not know of any increases in false alarms on stormy nights. On cross-examination, plaintiff agreed that he did not unholster his sidearm during his investigation.

The parties stipulated that a city administrator would testify that the Highland Park police department received 4,672 alarm calls in 2001 and 4,863 in 2000 and that less than 1% of those calls were "bona fide." The administrator also would testify that the Highland Park police department received "more than 20 alarm calls" on September 21, 2001, a number that was not unusual "during a power outage or strong storm." The witness would also testify that the weather that night was "stormy."

Matthew Maloney, who was plaintiff's police commander the night of plaintiff's injury, testified that he did not consider panic alarms always to constitute emergencies, because "[o]verwhelmingly they are false alarms." He also testified that electrical storms or thunderstorms cause false alarms. On cross-examination, he initially said that he had a practice of telling officers not to treat alarms as urgent if police had already investigated several false alarms the same night, but he later reversed his answer and said that he did not instruct officers not to take alarm calls seriously if police had already investigated several false alarms the same night.

The trial court ruled that plaintiff reasonably and actually believed that he was responding to an emergency at the time he was injured, because the alarm required "immediate action." Defendant timely appeals.

Section 10 of the Employee Benefits Act provides as follows, in pertinent part:

"In order for [a] law enforcement *** officer *** to be eligible for insurance coverage under this Act, the injury *** must have occurred as the result of the officer's response to fresh pursuit, the officer or firefighter's response to what is reasonably believed to be an emergency, an unlawful act perpetrated by another, or during the investigation of a criminal act." 820 ILCS 320/10(b) (West 2000).

On appeal, defendant challenges the trial court's conclusion that plaintiff was injured while responding "to what [was] reasonably believed to be an emergency" so as to qualify him for benefits under the Employee Benefits Act. To the extent defendant directs its argument at the definition to be ascribed the term "emergency" as used in the Employee Benefits Act and the application of that definition to the facts of this case, it presents questions of law, which we review de novo. In re Marriage of Best, 228 Ill. 2d 107, 116 (2008) (construction of a statute presents a legal question, to

be reviewed de novo). To the extent defendant challenges the trial court's factual finding regarding plaintiff's subjective belief that he was responding to an emergency, we review the trial court's finding to determine whether it is against the manifest weight of the evidence. See Franz v. Calaco Development Corp., 352 Ill. App. 3d 1129, 1139 (2004) (questions of fact receive manifest-weight review).

Our first task is to interpret the meaning of the term "emergency" as used in the Employee Benefits Act. The goal of statutory interpretation is to ascertain and give effect to the legislative intent, and the best indication of the legislative intent is the language used in the statute. Bigelow Group, Inc. v. Rickert, 377 Ill. App. 3d 165, 169 (2007). A court must give the language of a statute its plain, ordinary, and popularly understood meaning (Alvarez v. Pappas, 229 Ill. 2d 217, 228 (2008)), and, where the language is unambiguous, the statute must be given effect without resort to other aids of construction (Krautsack v. Anderson, 223 Ill. 2d 541, 553 (2006)).

Although the Employee Benefits Act does not provide a definition for the word "emergency" as it is used in section 10, the parties essentially agree on the meaning to be accorded it. Defendant directs **us** to dictionary definitions that indicate that the word "emergency" means "the 'urgent need for assistance or relief,' " or " 'an unforeseen combination of circumstances that calls for immediate action.' " Plaintiff cites a dictionary defining the term as " 'a sudden condition or state of affairs calling for immediate action.' " Our own resort to the dictionary yields a similar definition: Webster's Third New International Dictionary defines the word "emergency" primarily as "an unforeseen combination of circumstances or the resulting state that calls for immediate action." Webster's Third New International Dictionary 741 (1993). We agree with the parties that the above definitions are appropriate, and we interpret the word "emergency" as used in the Employee Benefits

Act consistently with the word's dictionary definition. A situation is therefore an "emergency" under the Employee Benefits Act where it is urgent and calls for immediate action.

Our second task is to apply the above definition to the case at hand to determine (1) whether plaintiff believed that he was facing an emergency and (2) whether that belief was reasonable. In arguing that plaintiff did not face an urgent situation requiring immediate action, defendant emphasizes that he did not use his overhead lights or siren to expedite his arrival on the scene, did not draw his gun, and did not call for backup assistance before beginning his investigation.

We take defendant's recitation of these facts as a challenge to the trial court's finding regarding plaintiff's subjective belief that he was facing an emergency, and we begin our analysis with that issue. Regarding the last two of the above facts, plaintiff's drawing his weapon or requesting backup might have indicated his belief that the situation was more dangerous, but those factors are not dispositive of his view of the exigency of the situation. (We also note that the last basis for criticism--plaintiff's failure to request backup--seems to derive from a trial exhibit in which the chief of police concluded in a memorandum that plaintiff did not face an emergency because, among other things, he did not use his overhead lights or siren and "did not await a back-up officer." These criticisms seem inconsistent; they assert that he should have expedited his arrival at the scene but waited before investigating.)

As for plaintiff's decision not to activate his lights or siren, he explained that he opted not to do so because he feared alerting any intruders in the residence but that he nonetheless traveled to the scene as quickly and safely as possible. We agree with plaintiff that it is possible that an officer would respond to an emergency without using lights or a siren because doing otherwise might pose the type of additional danger plaintiff described, and we therefore do not consider dispositive

plaintiff's failure to use his lights or siren. In any event, we see a distinction between a situation that requires "immediate action" and one that requires immediate and hurried action, and we think that the term "emergency" is broad enough to encompass not only a situation that necessitates the use of lights or sirens to expedite police response, but also a situation in which police must respond immediately but need not expedite their arrival through such disruptive means. Plaintiff may not have viewed the situation here as requiring that he use his lights or siren to expedite his arrival at the scene, but, by traveling to the scene without pause, he nonetheless acted in a manner consistent with a belief that the situation required his immediate response. We therefore will not disturb the trial court's finding that plaintiff believed he was responding to an emergency.

Defendant also disputes that plaintiff's belief was reasonable, because there was evidence that most of the alarms the police department received were false, especially during storms. (Indeed, defendant notes, the alarm to which plaintiff was responding at the time of his injury was itself later revealed to have been a false alarm.) At oral argument, defendant continued this statistical argument to its logical terminus, by asserting that a reasonable officer would not ascribe emergency status to any type of call that is bona fide less than 50% of the time. We disagree with defendant's approach. Even if a such a call is eventually determined not to be bona fide, an officer investigating the call cannot know whether it is bona fide until he has completed his investigation. Until the officer is able to eliminate the possibility of danger, even if remote, he must conclude that the call requires his immediate attention and thus that the call presents an emergency.

Defendant's contrary approach would lead to at least two unfortunate results. First, defendant would have officers delay their responses to potentially dangerous situations based on the notion that many similar situations in fact presented no bona fide need for response--it would have officers

assume that no emergency exists before ruling out the possibility of danger. Second, defendant would have the statistically likely outcome of a call control whether the call is an emergency, regardless of what actually happens on the call. For example, under the facts of this case, if plaintiff had slipped on the deck adjoining the house but afterwards discovered an intruder in the house, defendant would nonetheless assert that plaintiff's injury was not incurred in response to an emergency, because, even if the call was bona fide, it was the type of call that was statistically unlikely to be bona fide. We do not think the Employee Benefits Act supports either result; we instead hold that a call requires an officer's immediate response, and is therefore an emergency, until the officer eliminates the possibility that the call is bona fide.

For the same reason, we reject defendant's argument that plaintiff's belief was not reasonable because, even if the alarm initially presented an emergency, the situation had ceased being an emergency by the time plaintiff was injured, when plaintiff had already investigated and found no signs of burglary. Although plaintiff had discovered no signs of burglary by the time of his fall, he had only partially completed his investigation. In fact, he fell while trying to ascertain whether an intruder had gained entry into the house via the sliding glass door adjoining the deck. Because plaintiff had not yet eliminated the possibility of danger, the situation still required his immediate response, and his belief that he continued to face an emergency was reasonable.

In urging a contrary result, defendant cites several cases interpreting the word "emergency" in the context of the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act) (745 ILCS 10/1--101 et seq. (West 2006)) and in the context of sovereign immunity. See Sanders v. City of Chicago, 306 Ill. App. 3d 356 (1999) (Tort Immunity Act); Currie v. Lao, 148 Ill. 2d 151 (1992) (sovereign immunity). Under the Tort Immunity Act, which immunizes public

employees for their acts or omissions "in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct" (745 ILCS 10/2--202 (West 2006)), the immunity provided to police officers "extends only to negligent acts or omissions done while in the actual execution or enforcement of a law and not to every act or omission done while on duty as a public employee" (Morris v. City of Chicago, 130 Ill. App. 3d 740, 743 (1985)). Thus, an officer may be immunized from liability to third parties for damage caused by his disregarding traffic rules when he does so in response to an emergency, but not when he does so when there is no emergency. See Sanders, 306 Ill. App. 3d at 361 ("the emergency was over and *** a responding officer no longer had the right to disregard traffic rules"). Likewise, under the rule of sovereign immunity, an officer may be immune from damages for unsafe driving where the officer's "manner of operating a vehicle may be so unique to his employment that a lawsuit aimed at his negligent driving could operate to control the actions and policies of the State." Currie, 148 Ill. 2d at 160.

The logic inherent to the rule that officers should not be held liable to third parties for responses to emergencies is that officers must respond to emergencies, and, in emergency situations, officers will not have time to take the precautions normal citizens would take. Thus, the Tort Immunity Act and the rule of sovereign immunity take the extraordinary step of shielding officers from liability even for their dangerous acts in responding to emergencies. The Employee Benefits Act, on the other hand, extends coverage to officers not only in emergency situations that can necessitate unsafe conduct, but also where officers are injured responding to unlawful acts or "during the investigation of" criminal acts. 820 ILCS 320/10(b) (West 2000). The coverage provided by the Employee Benefits Act is thus not limited to situations that force officers to act without due care, and we can read the definition of "emergency" in this context more broadly than we might in a case

in which an officer seeks immunity (under the Tort Immunity Act or under sovereign immunity) on the ground that a situation was the type of "emergency" that necessitated a dangerous response.

Further, we disagree with defendant's assertion that the Tort Immunity Act and the Employee Benefits Act have a common purpose. According to defendant, "the purpose of both [statutes] is to protect public safety employees from the consequences of the high-risk actions that they must take, in the course of their employment, in furtherance of the public safety and welfare." Defendant's characterization of the purpose of the Tort Immunity Act is overly broad. The purpose of the Tort Immunity Act, as indicated by the legislature, is "to protect local public entities and public employees from liability arising from the operation of government" (emphasis added) (745 ILCS 10/1--101.1(a) (West 2006)). Since the above language is excerpted from the Tort Immunity Act, the type of "liability" it proscribes is obviously tort liability, and the Tort Immunity Act has nothing to do with the issue of liability for an injured officer's health care costs.

The policy behind the Tort Immunity Act is that public officials should not be liable to third parties for actions their offices require; a contrary rule would chill officials' ability to serve the public good. See Young v. Forgas, 308 Ill. App. 3d 553, 559 (1999) (if officials faced liability for performing their duties, their performance would be hampered). Likewise, the policy behind the doctrine of sovereign immunity is the idea that the threat of lawsuit should not be allowed to control State action. See Currie, 148 Ill. 2d at 159 ("The rationale [for] extending the immunity to State employees *** is that a suit against that employee could operate to control the actions of the State" (emphasis in original)). This policy is quite distinct from the policy underlying statutes such as the Employee Benefits Act, which provide continuing medical benefits to public servants injured in the line of duty. See Phalin v. McHenry County Sheriff's Department, 381 Ill. App. 3d 185, 189 (2008)

("the Act was designed to provide continuing health coverage for law enforcement officers and police officers who are disabled in the line of duty and for their families"), citing Krohe v. City of Bloomington, 204 Ill. 2d 392, 398 (2003). We therefore do not take guidance from the Tort Immunity Act and sovereign immunity cases on which defendant relies, and we instead adhere to the analysis we laid out above. Based on that analysis, we conclude that plaintiff was in fact injured while responding to what he reasonably believed to be an emergency, and he is therefore entitled to benefits under the Employee Benefits Act.

For the foregoing reasons, we affirm the judgment of the circuit court of Lake County.

Affirmed.

JORGENSEN and SCHOSTOK, JJ., concur.