Sixth Division
December 24, 2009

No. 1-09-0046

| | | |
|---|---|---|
| MICHAEL P. GAFFNEY, | ) | Appeal from the Circuit Court |
| | ) | of Cook County |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | 07 CH 20318 |
| THE BOARD OF TRUSTEES OF THE ORLAND FIRE | ) | |
| PROTECTION DISTRICT, PATRICK MAHER, as | ) | |
| President of the Board of Trustees, PATRICIA | ) | |
| CORCORAN, as Secretary of the Board of Trustees, and | ) | |
| the ORLAND FIRE PROTECTION DISTRICT, | ) | Honorable |
| | ) | Nancy J. Arnold, |
| Defendants-Appellees. | ) | Judge Presiding |

JUSTICE McBRIDE delivered the opinion of the court:

Plaintiff Michael J. Gaffney filed a two-count complaint against the defendants, the Board

of Trustees of the Orland Fire Protection District, president Patrick Maher, secretary Patricia

Corcoran, and the Orland Fire Protection District (collectively, the District), seeking a declaratory

judgment to compel the payment of plaintiff's health coverage benefits in accordance with section

10 of the Public Safety Employee Benefits Act (the Act) (820 ILCS 320/10 (West 2006)) and in

the alternative, for review under the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West

2006)) of the District's denial of his application for health coverage benefits under the Act. The

trial court dismissed the declaratory judgment count in June 2008, and later in December 2008,

the court considered plaintiff's remaining count under a common law writ of *certiorari* and

affirmed the District's denial of plaintiff's application.

Plaintiff appeals, arguing that (1) the District's consideration of plaintiff's request for

payment of his health insurance premiums pursuant to section 10 violated the terms of section 20

of the Act (820 ILCS 320/20 (West 2006)), which does not permit a home rule unit to provide benefits in a manner inconsistent with the Act and acts as a limitation on the home rule unit's powers under the Illinois Constitution; and (2) plaintiff's injury during a training exercise fire occurred during his response to what he reasonably believed was an emergency under section 10(b) of the Act (820 ILCS 320/10(b) (West 2006)).

Plaintiff was hired by the District as a firefighter and paramedic in May 1994. On July 27, 2005, plaintiff responded to a live-fire training exercise. His superior instructed plaintiff to treat the exercise as though it were an actual emergency call. Plaintiff's crew responded with lights and sirens running on the truck. Plaintiff's crew was told to rescue a "dummy" victim from the fire and to advance the fire hose into the building to contain the fire. Plaintiff donned full fire protection gear, including a breathing apparatus, and entered the building. The building was full of smoke with little to no visibility. Plaintiff found and removed the dummy victim on the second floor. Plaintiff and his crew also worked to advance a hose line through the building. After removing the dummy victim, they continued up to the third floor, where the fire was to be extinguished. The hose became entangled with an unseen object and plaintiff followed the hose line back to the obstruction. The hose was wrapped around a love seat and plaintiff used his dominant left arm to move the love seat to free the hose. When plaintiff moved the love seat, he severely injured his left shoulder. Plaintiff continued to participate in the exercise for a little while, but eventually stopped due to his injury. After plaintiff's injury, the training exercise ended. Plaintiff was later transported to the hospital. Except for light duty, plaintiff has not returned to work for the District since that day.

Following his injury, plaintiff applied for a line-of-duty disability pension from the District, which was granted in April 2007. Also in April 2007, plaintiff applied to the District to receive health coverage benefits under the Act. The Act allows emergency service personnel, including firefighters, and their families to continue receiving health benefits following a catastrophic injury or death that occurred while engaged in specified aspects of their job, such as when the firefighter was responding to what he or she reasonably believed was an emergency. See 820 ILCS 320/10 (West 2006). The District passed an ordinance directing the procedure for its firefighters to apply for these benefits under the Act. Plaintiff's application was continued to a special meeting of the District in May 2007. Although the ordinance does not require a hearing, plaintiff was permitted to present his case for benefits under the Act with his attorney at this meeting. After reviewing plaintiff's application and the facts of the case alongside the requirements of the Act, the board of trustees denied plaintiff's application, finding that plaintiff was not responding to what he reasonably believed was an emergency at the time of his injury.

In July 2007, plaintiff filed a complaint against the District in the circuit court for declaratory judgment, and in the alternative, for review of the District's denial of his application under the Administrative Review Law. The District moved to dismiss plaintiff's complaint pursuant to section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 2006)). In June 2008, the trial court granted the District's motion as to count I (declaratory judgment). The court also held that the Act did not expressly adopt the Administrative Review Law, and therefore, it did not apply. The court stated that it would consider plaintiff's remaining count as a petition for a common law writ of *certiorari*.

3

1-09-0046

In December 2008, following briefing and arguments, the trial court affirmed the District's denial of plaintiff's application for health coverage benefits under the Act. The court found:

"The plain meaning of the phrase, 'response to what is reasonably believed to be an emergency,' does not include participation in a training exercise, particularly where, as here, Plaintiff and his crew were given instructions prior to the start of the exercise. Read as a whole, the statute covers situations in which emergency response personnel are injured or killed while performing the very services they are charged with performing. Training exercises, although valuable as an educational tool to prepare officers and firefighters for the types of events they are expected to handle, are not responses to fresh pursuit or to what is reasonably believed to be an emergency, under any plain reading of the statute.

There was nothing unexpected about Plaintiff's 'response' to the call that began the exercise. Although the exercise was undeniably dangerous and presented certain unknown difficulties (as *expected* in any such exercise), danger and unknowns are not sufficient to constitute an emergency as that term is used in [the Act.] Plaintiff admits that his crew was instructed to treat the exercise as an actual call. Plaintiff and his crew therefore knew that

4

the exercise was not an emergency, or even a false alarm. As a

matter of law, Plaintiff could not have reasonably believed he was

responding to an emergency." (Emphasis in original.)

This appeal followed.

On appeal, plaintiff argues that (1) the District was not permitted to pass an ordinance outlining a process for plaintiff to apply for benefits and its consideration of said application was not authorized under the Act; and (2) plaintiff's injury occurred during his response to what he reasonably believed was an emergency.

Initially, we must address the District's argument that this court lacks jurisdiction to consider plaintiff's first argument because his notice of appeal only indicated that he was appealing from the December 10, 2008, order denying him benefits and did not mention the June 13, 2008, order dismissing the declaratory judgment count of the complaint. Generally, when a final order has been entered in a case, all nonfinal orders previously entered may be reviewed by the appellate court. Reed v. Retirement Board of the Fireman's Annuity & Benefit Fund, 376 Ill. App. 3d 259, 267 (2007). "An order is final and appealable if it terminates the litigation between the parties on the merits or disposes of the rights of the parties, either on the entire controversy or a separate part thereof." R.W. Dunteman Co. v. C/G Enterprises, Inc., 181 Ill. 2d 153, 159 (1998). "An appeal from a final judgment draws into question all earlier nonfinal orders that produced the judgment." Pekin Insurance Co. v. Pulte Home Corp., 344 Ill. App. 3d 64, 67-68 (2003). Here, the June 13, 2008, order was a nonfinal order as it only dismissed one count of plaintiff's complaint and left the remaining count for further action. In contrast, the December 10,

1-09-0046

2008, order was a final order in this case and plaintiff filed a timely appeal of that order. Since we may consider nonfinal orders following final judgment, any questions regarding the June 13, 2008, order are properly before this court.

In determining the appropriate standard of review, we need to clarify the procedural posture of this case, including the reviewability of the District's decision. Plaintiff contends that pursuant to section 20 of the Act, the District had no authority to conduct any review of his claim for health coverage benefits under the Act, and thus, the District's decision is not entitled to deference.

"Whether an agency action is reviewable is an issue of statutory construction." Outcom, Inc. v. Illinois Department of Transportation, 233 Ill. 2d 324, 332 (2009). "Courts must consider whether the statute which confers power on the agency to act indicates that the legislature intended the agency's decisions to be reviewable. Frequently, the legislature's intent is clear because the agency's enabling statute expressly provides for review under our Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2006))." Outcom, 233 Ill. 2d at 332-33. However, when the enabling statute does not adopt the Administrative Review Law and provides no other method for reviewing the agency's decision, then " 'the writ of common law *certiorari* survives as an available method of review.' " Outcom, 233 Ill. 2d at 333, quoting Smith v. Department of Public Aid, 67 Ill. 2d 529, 541 (1977). The presumption behind the use of *certiorari* is that most agency decisions are reviewable, but there is no presumption of reviewability if there is a statutory bar or statutory language directing that the agency's decision is up to its unreviewable discretion. Outcom, 233 Ill. 2d at 333.

6

Here, it is uncontroverted that the Act does not adopt the Administrative Review Law. 820 ILCS 320/1 *et seq.* (West 2006). Thus, any review would have to be pursuant to a common law writ of *certiorari*. Our standard of review under a writ of *certiorari* is essentially the same as under the Administrative Review Law. First Access Material Handling v. Wish, 297 Ill. App. 3d 396, 402 (1998). "When reviewing an administrative agency's decision, we are limited to determining whether the decision is against the manifest weight of the evidence." First Access, 297 Ill. App. 3d at 402. However, we review any legal questions raised *de novo*. First Access, 297 Ill. App. 3d at 402. Any question as to the interpretation of the Act presents a legal question that we review *de novo*, but to the extent that this determination involves a factual finding, we review that to determine if it is against the manifest weight of the evidence. DeRose v. City of Highland Park, 386 Ill. App. 3d 658, 660 (2008).

Plaintiff argues that the District lacked authority to enact an ordinance or otherwise consider his claim for health coverage benefits because section 20 of the Act is a limitation on those powers. The District maintains that the Act does not restrict its authority to pass all necessary ordinances for the proper management and conduct of its business.

Section 20 of the Act provides:

> "Home rule. An employer, including a home rule unit, that
> employs a full-time law enforcement, correctional or correctional
> probation officer, or firefighter may not provide benefits to persons
> covered under this Act in a manner inconsistent with the
> requirements of this Act. This Act is a limitation under subsection

7

(i) of Section 6 of Article VII of the Illinois Constitution on the

concurrent exercise of powers and functions exercised by the

State." 820 ILCS 320/20 (West 2006).

Plaintiff asserts that this statute prohibits the District from enacting an ordinance outlining the application process for catastrophically injured firefighters to receive health coverage benefits. Plaintiff argues that the District violated this statute when it enacted Ordinance No. 2003-04, entitled "AN ORDINANCE ADOPTING A POLICY REGARDING CONTINUATION OF INSURANCE BENEFITS UNDER THE PUBLIC SAFETY EMPLOYEE BENEFIT ACT." The ordinance stated that the Board of Trustees "determined that there [was] a need to adopt a policy regarding the continuation of health insurance benefits for certain firefighters and/or their families" pursuant to section 10 of the Act. Orland Park Fire District, Ordinance No. 2003-04 (eff. May 14, 2003). The ordinance adopted an attached policy and directed the fire chief to disseminate the policy to all District employees. The policy states:

"When a line of duty disability or surviving spouse pension is

granted by the Board of Trustees of the Orland Firefighters'

Pension Fund and the pensioner is interested in requesting health

insurance benefits for him or herself, his or her spouse, and/or

dependent children, he/she shall complete the 'Application for

Continuation of Insurance Benefits under the Public Safety

Employee Benefits Act.' The application will be reviewed to

determine if the requirements of the Act have been met, including,

8

but not limited to, the following:

    1. The catastrophic injury or death for which a line-of-duty pension or surviving spouse pension was granted must have occurred since November 14, 1997; and

    2. The injury or death must have occurred as a result of the firefighter's response to what is reasonably believed to be an emergency, an unlawful act perpetrated by another, or during the investigation of a criminal act.

If the application is approved, the pensioner, spouse and/or dependent children shall receive basic group health insurance at no cost. Any health insurance benefits payable from any other source shall reduce benefits payable under the Act and this policy. (820 ILCS 320/10)."

This ordinance mirrors that language used in section 10 of the Act, which requires (1) a catastrophic injury or death; and (2) the injury or death occurred as a result of the police officer's or firefighter's response to what is reasonably believed to be an emergency, an unlawful act perpetrated by another, or during the investigation of a criminal act. See 820 ILCS 320/10 (West 2006).

Plaintiff argues at length that this ordinance is prohibited under section 20 of the Act, but fails to explain how the ordinance violates section 20. Section 20 limits home rule units application of the Act in that, the home rule units "may not provide benefits to persons covered

under this Act in a manner inconsistent with the requirements of this Act." 820 ILCS 320/20 (West 2006). Plaintiff has not asserted how the ordinance is inconsistent with the Act, but instead claims that the ordinance "is not a neutral and benign procedure" and "is tantamount to creating an ordinance that requires a hearing for the payment of utilities bills." Plaintiff's arguments imply that payment of health coverage benefits under the Act is presumed without any consideration of the Act. We disagree.

We point out that section 6 of the Fire Protection District Act (70 ILCS 705/1 *et seq.* (West 2008)) specifically authorizes the Board of Trustees to provide and pay for health insurance benefits to its employees (70 ILCS 705/6(e) (West 2008)) as well as the power to pass all necessary ordinances for the proper management and conduct of its business (70 ILCS 705/6(i) (West 2008)). Additionally, section 10-4-2(c) of the Illinois Municipal Code provides that a corporate authority "may enact an ordinance prescribing the method of operation of the insurance program." 65 ILCS 5/10-4-2(c) (West 2006). Under these statutes, the District's board of trustees was within its statutory power to pass an ordinance outlining the "method of operation" for those firefighters seeking health insurance benefits under the Act.

"[A]n ordinance cannot add to, subtract from, or affect a statute's provisions, and if the ordinance conflicts with the statute, it is invalid." JLR Investments, Inc. v. Village of Barrington Hills, 355 Ill. App. 3d 661, 666 (2005). In this case, the ordinance in question does not conflict with or affect any of the provisions under the Act. The ordinance outlines a procedure in which firefighters may receive health coverage benefits under the Act. It does not impose any substantive requirements of a firefighter that are inconsistent with the Act. If a firefighter (or

his/her spouse) would like to receive health coverage benefits under the Act, then an application is filed that describes the injury or death and circumstances surrounding the injury. The application is reviewed to determine if it satisfies section 10 of the Act. This process is not inconsistent with the Act.

Plaintiff also asserts that since the Act "contains absolutely no provision creating an administrative procedure for the adjudication of claims," then pursuant to article VI, section 9, of the Illinois Constitution of 1970, the circuit court has exclusive jurisdiction. However, plaintiff fails to consider the statutes we have previously cited which explicitly designate the District's board of trustees to oversee the management and payment of health insurance benefits to its employees and that, as part of that power, the board may pass ordinances to assist in the management of its business. The ordinance passed explaining the board's policy for considering claims under the Act did not divest the circuit court of jurisdiction since the board had the power to administer health insurance benefits to its employees. Therefore, the District had the authority to consider plaintiff's application for benefits under the Act.

Next, we turn to the question of whether plaintiff is entitled to health coverage benefits under the Act.

Section 10 of the Act provides, in relevant part:

"(a) An employer who employs a full-time law enforcement, correctional or correctional probation officer, or firefighter, who, on or after the effective date of this Act suffers a catastrophic injury or is killed in the line of duty shall pay the entire premium of the

11

employer's health insurance plan for the injured employee, the injured employee's spouse, and for each dependent child of the injured employee until the child reaches the age of majority or until the end of the calendar year in which the child reaches the age of 25 if the child continues to be dependent for support or the child is a full-time or part-time student and is dependent for support.  * * *

(b) In order for the law enforcement, correctional or correctional probation officer, firefighter, spouse, or dependent children to be eligible for insurance coverage under this Act, the injury or death must have occurred as the result of the officer's response to fresh pursuit, the officer or firefighter's response to what is reasonably believed to be an emergency, an unlawful act perpetrated by another, or during the investigation of a criminal act. Nothing in this Section shall be construed to limit health insurance coverage or pension benefits for which the officer, firefighter, spouse, or dependent children may otherwise be eligible." 820 ILCS 320/10 (West 2006).

It is uncontested by the parties that plaintiff suffered a catastrophic injury that satisfies section 10(a) of the Act. Therefore, the only question before us is whether the injury occurred while plaintiff was engaged in one of the listed tasks. Plaintiff argues that his injury occurred while he was responding to what he "reasonably believed to be an emergency." The District

responds that plaintiff's injury during a training exercise does not qualify as a response to what plaintiff "reasonably believed to be an emergency."

First, we examine what the meaning of the term "emergency" is as used in the Act. The cardinal rule in construing a statute, to which all others are subordinate, is to ascertain and give effect to the intent of the legislature. Alvarez v. Pappas, 229 Ill. 2d 217, 228 (2008). To determine legislative intent, we turn to the language of the statute, which is the best indicator of its intent. Alvarez, 229 Ill. 2d at 228. We must give the statutory language "plain, ordinary, and popularly understood meaning," and "[w]here the language is clear and unambiguous, the statute must be given effect as written without resort to further aids of statutory construction." Alvarez, 229 Ill. 2d at 228. "[A]ll words and phrases must be interpreted in light of other relevant provisions of the statute and must not be construed in isolation." Brucker v. Mercola, 227 Ill. 2d 502, 514 (2007). "Each word, clause and sentence of the statute, if possible, must be given reasonable meaning and not rendered superfluous." Brucker, 227 Ill. 2d at 514.

In DeRose v. City of Highland Park, 386 Ill. App. 3d 658 (2008), the Second District considered the same provision of section 10(b). In that case, a police officer responded to a call where a residential burglary alarm had been triggered. When he arrived at the residence, the officer investigated the property to check for open doors or broken windows. While approaching a rear sliding glass door, the officer slipped, fell and sustained an injury to his shoulder. The officer continued investigating the property and concluded that the alarm had been a false alarm. DeRose, 386 Ill. App. 3d at 659. Following a bench trial, the officer was awarded health coverage benefits under the Act. DeRose, 386 Ill. App. 3d at 660.

1-09-0046

On appeal, the City of Highland Park (the City) contended that the officer was not responding to what was "reasonably believed to be an emergency." DeRose, 386 Ill. App. 3d at 660. The reviewing court first considered the meaning of "emergency" as it applied to the Act.

> "Although the Employee Benefits Act does not provide a definition for the word 'emergency' as it is used in section 10, the parties essentially agree on the meaning to be accorded it. Defendant directs us to dictionary definitions that indicate that the word 'emergency' means ' the "urgent need for assistance or relief," ' or ' "an unforeseen combination of circumstances that calls for immediate action." ' Plaintiff cites a dictionary defining the term as ' "a sudden condition or state of affairs calling for immediate action." ' Our own resort to the dictionary yields a similar definition: Webster's Third New International Dictionary defines the word 'emergency' primarily as 'an unforeseen combination of circumstances or the resulting state that calls for immediate action.' Webster's Third New International Dictionary 741 (1993). We agree with the parties that the above definitions are appropriate, and we interpret the word 'emergency' as used in the Employee Benefits Act consistently with the word's dictionary definition. A situation is therefore an 'emergency' under the Employee Benefits Act where it is urgent and calls for immediate

14

action." <u>DeRose</u>, 386 Ill. App. 3d at 660-661.

The court in <u>DeRose</u> applied this definition to the circumstances of the case to determine if the officer believed he was responding to an emergency, and if so, if that belief was reasonable. <u>DeRose</u>, 386 Ill. App. 3d at 661. The City argued that the officer did not believe he was responding to an emergency because he did not use sirens or lights when he traveled to the location of the alarm. However, the reviewing court did not find this failure to use sirens and lights to be dispositive, particularly because the officer had explained that he did not wish to alert any potential intruder as to his arrival on the scene. <u>DeRose</u>, 386 Ill. App. 3d at 661-62. Further, the court noted that the officer "may not have viewed the situation here as requiring that he use his lights or siren to expedite his arrival at the scene, but, by traveling to the scene without pause, he nonetheless acted in a manner consistent with a belief that the situation required his immediate response" and concluded that the officer believed he was responding to an emergency. <u>DeRose</u>, 386 Ill. App. 3d at 662.

In considering whether the officer's belief was reasonable, the City contended that most of the alarms received by the police department were false, which ended up being true in that case. The reviewing court dismissed this argument as its application could cause police officers to delay response to potentially dangerous calls based on prior situations that resulted in no *bona fide* need for a response and the call could control whether a situation was an emergency based on the statistical likelihood of a *bona fide* need for a response. <u>DeRose</u>, 386 Ill. App. 3d at 662-63. The court held that "a call requires an officer's immediate response, and is therefore an emergency, until the officer eliminates the possibility that the call is *bona fide*." <u>DeRose</u>, 386 Ill. App. 3d at

663. Since the officer had an immediate response to the call and had not yet eliminated the possibility of danger when he was injured, the DeRose court concluded that the officer's belief that he continued to face an emergency was reasonable. DeRose, 386 Ill. App. 3d at 663.

We agree with the DeRose court's conclusion that an "emergency" under the Act occurs when the incident "is urgent and calls for immediate action." Next, we need to determine whether plaintiff believed he was responding to an emergency, and if so, was plaintiff's belief reasonable. Unlike the circumstances present in DeRose, plaintiff was not responding to a call from the public, but participating in a live-fire training exercise. Plaintiff argues that he was reasonable in his belief that "he was confronted by an emergency situation because he [was] directly ordered to believe that this [training exercise] was an emergency." The District maintains that the training exercise was not an "emergency" because the firefighters were told what the goal of the training exercise was: to rescue the dummy victim and advance the fire hose to put out the fire. The District asserts that, "[b]y definition, these pre-planned situations cannot be classified as an unforeseen combination of circumstance for which the General Assembly intended Section 10(b) coverage."

Plaintiff's testimony before the District establishes that he did not believe he was responding to an emergency. Plaintiff knew that this training exercise was not an actual emergency and that it was a live-fire training exercise. Plaintiff noted that not all training exercises involve a live fire. Even though plaintiff was instructed to treat the training exercise as an emergency, an instruction to treat a training exercise as though it were an emergency does not make it an emergency under the language of the statute. In fact, it illustrates the opposite: a

16

training exercise is not inherently an emergency. He and his crew were given specific instructions and tasks to accomplish during the training exercise. Additionally, after plaintiff was injured, the training exercise was stopped. Here, plaintiff's testimony shows that he believed that he was responding to a training exercise, albeit one that involved a live fire, and not an emergency. Therefore, plaintiff did not have a reasonable belief that he was responding to an emergency and is not entitled to benefits under the Act.

We find further support for our conclusion by considering the language employed in the applicable line-of-duty disability pension statute. That statute states, in relevant part,

"[i]f a firefighter, as the result of sickness, accident or injury incurred in or resulting from the performance of an act of duty or from the cumulative effects of acts of duty, is found, pursuant to Section 4-112, to be physically or mentally permanently disabled for service in the fire department, so as to render necessary his or her being placed on disability pension ***." 40 ILCS 5/4-110 (West 2006). Under this statute, a firefighter is eligible for a line-of-duty disability pension if the injury or illness occurred during "the performance of an act of duty or from the cumulative effects of acts of duty." This language is broader than that used under the Act as it encompasses any injury that occurred during an "act of duty." Under this statute, participation in a required training exercise would be an "act of duty." See O'Callaghan v. Retirement Board of Firemen's Annuity & Benefit Fund, 302 Ill. App. 3d 579 (1998) (finding that a knee injury incurred during a candidate training class was an act of duty).

In contrast, the Act did not use the phrase "act of duty," instead adopting a narrower application for the specifically referenced occurrences: "the officer's response to fresh pursuit, the

17

officer or firefighter's response to what is reasonably believed to be an emergency, an unlawful act perpetrated by another, or during the investigation of a criminal act." 820 ILCS 320/10 (West 2006). The dissent cites to comments made by members of the General Assembly introducing the bill creating the Act by describing it as "provid[ing] that for full-time law enforcement officers and firefighters that are killed or disabled in the line of duty shall continue the health benefits for the officer or the firefighter, their spouses and their children." 90th Ill. Gen. Assem., Senate Proceedings, May 16, 1997, at 192 (statements of Senator Donahue). We point out that "while courts give some consideration to statements by a sponsor of a bill, such statements are not controlling." Kunkel v. Walton, 179 Ill. 2d 519, 536 (1997). Significantly, the legislature declined to use the phrase "line of duty" in drafting the bill. Instead, subsection (b) limits health benefits coverage to four specific circumstances during which the death or catastrophic injury occurred. "Generally, when the legislature uses certain words in one instance and different words in another, different results were intended." Emerald Casino, Inc. v. Illinois Gaming Board, 346 Ill. App. 3d 18, 35 (2003). Here, the difference in statutory language illustrates the legislative intent that the Act be applied narrower than the line of duty disability pension.

While we understand plaintiff's position in seeking health benefits coverage, we conclude that the legislature did not intend for the statute to be applied under the facts of this case.

Based on the foregoing reasons, we affirm the decision of the circuit court of Cook County.

Affirmed.

CAHILL, P.J., concurs.

1-09-0046

JUSTICE ROBERT E. GORDON, dissenting:

I respectfully dissent. The majority asks us to believe that an emergency, as defined under the Public Safety Employees Benefit Act (the Act) (820 ILCS 320/10 (West 2006)), cannot exist in a firefighter training exercise. That is simply not true. In the case at bar, an emergency developed in the course of a firefighter training exercise and a firefighter was catastrophically injured while responding to it. The legislature enacted the Act in order to provide health insurance coverage to public safety employees, and their families, who are catastrophically injured in the line of duty (90th Ill. Gen. Assem., Senate Proceedings, May 16, 1997, at 192 (statements of Senator Donahue)), as was the plaintiff in this case, and we should ensure that a firefighter obtains what is due to him under the Act. Firefighters put their lives on the line for the public on a daily basis.

In the case at bar, plaintiff served as a firefighter and paramedic with the Orland Park Fire Protection District (District) from 1994 until 2005, when he received a catastrophic injury in the course of a training exercise in which he engaged as part of his employment with the District. On July 27, 2005, plaintiff and a team of District firefighters engaged in a live-fire training exercise and were told by their supervisors that they were to treat the exercise as an emergency. The firefighters proceeded with lights and sirens to a burning building, which contained several obstacles and a dummy victim inside. Plaintiff's assignment in the exercise included bringing a hose to the location of the fire inside the building and locating the dummy victim.

Upon arriving at the scene, plaintiff donned fire protection gear and a self-contained breathing apparatus tank before entering the burning building. Plaintiff proceeded through the building to the second floor, where he and his team rescued the dummy victim. At this time, the building was filled with

19

smoke and visibility was nonexistent.

After rescuing the dummy victim, plaintiff and his team proceeded to the third floor of the building in order to extinguish the fire. While they advanced toward the source of the fire, plaintiff's fire hose became stuck on a then-unknown object, effectively trapping plaintiff and his team near a burning fire in an area with several obstacles and no visibility. At this point, plaintiff retraced the hose, found that it was tangled around a loveseat, and proceeded to free the hose. In the course of freeing the fire hose, plaintiff suffered a catastrophic injury to his left shoulder that has prevented him from serving as a firefighter since the July 27, 2005, incident. He was later placed on permanent duty disability.

The instant case turns on what the legislature meant by the term "emergency" or "what is reasonably believed to be an emergency" in the Public Safety Employees Benefit Act (820 ILCS 320/10 (West 2006)). The statute provides, in relevant part:

"(a) An employer who employs a full-time law enforcement, correctional or correctional probation officer, or firefighter, who, on or after the effective date of this Act suffers a catastrophic injury or is killed in the line of duty shall pay the entire premium of the employer's health insurance plan for the injured employee, the injured employee's spouse, and for each dependent child of the injured employee until the child reaches the age of majority or until the end of the calendar year in which the child reaches the age of 25 if the child continues to be dependent for support or the child is a full-time or part-time student and is dependent for support. ***

20

(b) In order for the law enforcement, correctional or correctional probation officer, firefighter, spouse, or dependent children to be eligible for insurance coverage under this Act, the injury or death must have occurred as the result of the officer's response to fresh pursuit, the officer or firefighter's response to what is reasonably believed to be an emergency, an unlawful act perpetrated by another, or during the investigation of a criminal act. Nothing in this Section shall be construed to limit health insurance coverage or pension benefits for which the officer, firefighter, spouse, or dependent children may otherwise be eligible." (Emphasis added.) 820 ILCS 320/10 (West 2006).

When construing a statute, we must "ascertain and give effect to the legislature's intent" and "the best indication of legislative intent is the statutory language, given its plain and ordinary meaning." People v. Pack, 224 Ill. 2d 144, 147 (2007).

The legislature did not provide us with a definition of "emergency" in the Act, and so we must determine under what circumstances the legislature intended the Act to apply. In other words, we must determine what is "reasonably believed to be an emergency." 820 ILCS 320/10 (West 2006). First I note that the legislature explicitly declined to limit the Act to actual emergencies. If the legislature had intended to limit the Act to actual emergencies, in other words, to exclude training exercises, it could have done so. Instead, the legislature chose to use the phrase "what is reasonably believed to be an emergency," which indicates that a firefighter's subjective beliefs in the particular situation control.

Some additional guidance can be found in the House and Senate transcripts of the discussions

preceding the passage of the Act. I cannot use the term "debates" to refer to these statements because there was no debate about the passage of the Act. In fact, the Act was never debated in the General Assembly. Instead, Representative Tenhouse and Senator Donahue each made statements generally describing the proposed bill to their respective legislative bodies. Prior to a vote in the House, Representative Tenhouse made the following remarks describing the Act: "1347 [the Act] is a simple Bill. It simply provides that full-time law enforcement officers and firefighters that are killed or disabled in the line of duty, we're going to continue the health benefits for the officer's children and spouse." 90th Ill. Gen. Assem., House Proceedings, April 14, 1997, at 180 (statements of Representative Tenhouse).

Senator Donahue expanded on Representative Tenhouse's remarks and explained the impetus for the Act: compliance with federal legislation that would bring federal funding for crime-fighting efforts to the State of Illinois. As Senator Donahue explained:

"House Bill 1347 creates the Public Safety Employees Benefit Act, and what this bill does is because of legislation that was passed at the federal level, many of our districts or our areas are receiving federal funds for more policemen. And in a caveat in that legislation, it says that those federal funds are contingent on passing a benefits Act. And what this does is that it provides that for full-time law enforcement officers and firefighters that are killed or disabled in the line of duty shall continue the health benefits for the officer or the firefighter, their spouses and their children. I think this is a very important piece of legislation. I'm not one that normally passes onto a mandate at the local

level, but I think this is worth it, and it's something very necessary." 90th

Ill. Gen. Assem., Senate Proceedings, May 16, 1997, at 192 (statements

of Senator Donahue).

The only debate that occurred regarding the Act took place not within the legislature but rather

between the legislature and the Governor, who initially vetoed the Act. On October 28, 1997, the House

overrode the Governor's veto by a vote of 115 to 1. 90th Ill. Gen. Assem., House Proceedings, October

28, 1997, at 16 (statements of Representative Hannig). Two weeks later on November 14, 1997, the

Senate overrode the Governor's veto by a vote of 58 to 1, and the Act was passed into law. 90th Ill.

Gen. Assem., Senate Proceedings, November 14, 1997, at 136 (statements of Senator Dudycz).

Every time a legislator discussed the contents of the Act, he employed the phrase "killed or

disabled in the line of duty." 90th Ill. Gen. Assem., House Proceedings, April 14, 1997, at 180 (statements

of Representative Tenhouse); 90th Ill. Gen. Assem., Senate Proceedings, May 16, 1997, at 192

(statements of Senator Donahue); 90th Ill. Gen. Assem., House Proceedings, October 28, 1997, at 16

(statements of Representative Tenhouse); 90th Ill. Gen. Assem., Senate Proceedings, November 14, 1997,

at 136 (statements of Senator Donahue). In addition, when asking the Senate to override the Governor's

veto, Senator Donahue expressly stated that the legislature intended the phrase "catastrophically

injured" to mean injuries suffered by a police officer or firefighter whose injury qualified him to take a line

of duty pension under section 6-151 of the Pension Code (40 ILCS 5/6-151 (West 2006)). 90th Ill. Gen.

Assem., Senate Proceedings, November 14, 1997, at 136 (statements of Senator Donahue). In

O'Callaghan v. Retirement Board of Firemen's Annuity & Benefit Fund of Chicago, 302 Ill. App. 3d 579

(1998), the fourth division of this district held that a firefighter injured during a training drill was eligible

for a line of duty disability pension. 302 Ill. App. 3d at 583-84. I see nothing in the text of the Act or its legislative history to indicate that firefighters injured during training exercises, especially live fire exercises, in which an emergency develops should be excluded from benefits under the Act.

The Second District in DeRose v. City of Highland Park, 386 Ill. App. 3d 658 (2008), determined a definition of "emergency" under the Act. The DeRose court found that "a situation is therefore an 'emergency' under the Employee Benefits Act where it is urgent and calls for immediate action." 386 Ill. App. 3d at 661. Black's Law Dictionary provides a similar definition of "emergency circumstances," which are defined under the term "exigent circumstances." It states: "Exigent circumstances may exist if (1) a person's life or safety is threatened, (2) a suspect's escape is imminent, or (3) evidence is about to be removed or destroyed." Black's Law Dictionary 277 (9th ed. 2009).

Nowhere in either of these definitions is there dependence on whether the situation is or is not part of a training exercise. Instead, the definitions focus on a threat presented that demands immediate attention.

The majority agrees with the DeRose court and found that an "emergency" under the Act constitutes a situation that " 'is urgent and calls for immediate action.' " Slip op. at 16. Under this definition, the majority fails to find an emergency situation in a training exercise, arguing, "a training exercise is not inherently an emergency." Slip op. at 16-17. I can accept that proposition. However, the majority continues and claims that when plaintiff began the training exercise, "he believed that he was responding to a training exercise, albeit one that involve a live fire, and not an emergency." Slip op. at 17.

The majority's analysis focuses on what was the plaintiff's belief at the inception of the exercise, but that is not when the emergency occurred. This argument is flawed because it presumes that an

24

emergency situation cannot develop during a training exercise. Under its reasoning, the majority would have us believe that because a firefighter knows that he is engaging in a training exercise, the situation would, by definition, never be an emergency, regardless of what occurred after the exercise began. Thus, even if the live fire became out of hand and the building burned down with the firefighters, that would not constitute an emergency.

Nevertheless, even under the majority's definition of "emergency," the plaintiff has still established that an emergency arose in the course of the July 27, 2005, training exercise. The parties' briefs and the majority opinion focus a great deal of attention on the fact that plaintiff not only was participating in a training exercise but also that he knew that he was engaging in a training exercise. Nothing in the Act compels us to consider the incident only at its inception. Rather, the statute directs us to consider "the officer or firefighter's response to what is reasonably believed to be an emergency." 820 ILCS 320/10(b) (West 2006). As the majority's definition of "emergency" tells us, we must determine whether a situation occurred that was "urgent and call[ed] for immediate action." Slip op. at 16. We do not sit with blinders on and say that an emergency cannot occur in a training exercise. If the legislature intended an emergency not to apply in a training exercise, it would have said so in the statute.

When I look at the facts presented by the plaintiff, it is clear that plaintiff suffered his injury during his response to "what is reasonably believed to be an emergency." 820 ILCS 320/10(b) (West 2006). When plaintiff's fire hose became stuck, an emergency arose. Plaintiff and his team were halted on the third floor of a burning building, near the source of the fire without water because of a tangled hose. Smoke from the fire obscured all visibility in the building and plaintiff could not advance the hose to extinguish the fire until the obstruction was removed. A team of firefighters stuck on the third floor of a

25

burning building, with no visibility, and unable to put out the fire without plaintiff's actions to remove the obstruction seems like an emergency under the plain meaning of the term. The situation was " 'urgent and call[ed] for immediate action.' " Slip op. at 16.

Firefighter training exercises can be extremely dangerous. Between 1987 and 2001, fire departments around the country reported an average of 6,700 training-related injuries every year. U.S. Fire Admin., Department of Homeland Security, USFA-TR-100, Special Report: Trends and Hazards in Firefighter Training 7 (May 2003). These injuries include sprains/strains, heart attack or stroke, smoke/gas inhalation and other respiratory ailments, dislocations and fractures, burns, and other wounds. U.S. Fire Admin., Department of Homeland Security, USFA-TR-100, Special Report: Trends and Hazards in Firefighter Training 7 (May 2003). In addition, the number of firefighter training-related fatalities each year has increased from 1987 to 2001. U.S. Fire Admin., Department of Homeland Security, USFA-TR-100, Special Report: Trends and Hazards in Firefighter Training 8 (May 2003). Live-fire training exercises, in particular, "pose a significant risk to trainees and instructors." U.S. Fire Admin., Department of Homeland Security, USFA-TR-100, Special Report: Trends and Hazards in Firefighter Training 12 (May 2003).

While, as the majority posits, "a training exercise is not inherently an emergency" (slip op. at 16-17), the dangers inherent in a live-fire training exercise can lead to an emergency situation at any time. Plaintiff and his team were lucky; they survived the fire and benefitted greatly from plaintiff's actions in freeing the fire hose. Plaintiff's efforts in responding to an emergency – freeing the fire hose, and thus saving his team from a perilous situation – are exactly the sort of acts that the legislature sought to reward when it passed the Act.

The trial court erred in denying plaintiff benefits under the Act.

26

1-09-0046