In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-2905

ADT SECURITY SERVICES, INC., *et al.*,

*Plaintiffs-Appellees*,

*v.*

LISLE-WOODRIDGE FIRE PROTECTION DISTRICT,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:10-cv-04382—**Milton I. Shadur**, *Judge.*

ARGUED NOVEMBER 17, 2011—DECIDED FEBRUARY 27, 2012

Before WOOD, TINDER, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* This appeal presents issues of state law governing the powers of Illinois fire protection districts. Defendant-appellant Lisle-Woodridge Fire Protection District (the District) adopted an ordinance in 2009 requiring commercial buildings and multi-family

residences to have fire alarms equipped with wireless radio technology that would send alarm signals directly to the central monitoring "board" operated by the District. The 2009 ordinance further provided that the District would contract with just one private alarm company to provide and service the signaling equipment. As a result, all commercial and multi-family buildings would have had to become customers of the District, displacing the plaintiffs-appellees in this case, several private fire alarm companies that have competed for these customers' business for many years.

The alarm companies sued the District on claims under the United States Constitution, federal antitrust law, and state law. Without reaching the federal claims, the district court granted summary judgment for the plaintiff alarm companies on the basis of state law and permanently enjoined the District from implementing the new ordinance. *ADT Security Services, Inc. v. Lisle-Woodridge Fire Prevention Dist.*, 799 F. Supp. 2d 880 (N.D. Ill. 2011). The District has appealed. We affirm in part and reverse in part. We hold that the District has the statutory authority to require that commercial and multi-family buildings connect directly to the District's monitoring board, and to do so through wireless radio technology. We reverse the district court's injunction to the extent it prohibited implementation of those portions of the 2009 ordinance. But we also hold that the District

does not have the authority to displace the entire private market by requiring all customers to buy alarm signaling services and equipment from itself or just one private company. We affirm those portions of the district court's injunction and remand for further proceedings.

## I. *Factual and Procedural History*

In assessing whether the plaintiff alarm companies are entitled to summary judgment, we review the record in the light most favorable to the District, the non-moving party, drawing all reasonable inferences in its favor. See *Lesch v. Crown Cork & Seal Co.*, 282 F.3d 467, 471 (7th Cir. 2002).

### A. *The Illinois Fire Protection District Act*

The Illinois Fire Protection District Act (the Act) allows two or more local governments to consolidate fire protection and related services by creating a fire protection district. 70 ILCS 705/1 *et seq.* Such districts operate with their own elected boards that exercise the powers spelled out in the Act. These include the powers to buy or lease firefighting equipment, employ firefighters, and impose civil fines for setting false fire alarms, 70 ILCS 705/6, as well as the authority to tax district residents to pay for the fire protection services in the district. 70 ILCS 705/14.

Illinois law does not grant fire protection districts general home rule powers. Instead, Illinois courts have held that fire protection districts are limited to the powers expressly granted by statute. *Wilkes v. Deerfield-Bannockburn Fire Protection Dist.*, 399 N.E.2d 617, 622-23 (Ill. App. 1979); *Glenview Rural Fire Protection Dist. v. Raymond*, 311 N.E.2d 302, 304-05 (Ill. App. 1974). The Illinois General Assembly has amended the Act from time to time to grant fire protection districts specific additional powers. See, *e.g.*, Pub. Act 85-1285, § 1, effective Jan. 1, 1989 (codified at 70 ILCS 705/11g) (services for responding to emergencies involving hazardous materials); Pub. Act 81-1375, § 1, effective Aug. 9, 1980 (codified at 70 ILCS 705/11) (emergency ambulance service); Pub. Act 81-869, § 1, effective Jan. 1, 1980 (codified at 70 ILCS 705/11e) (street-address numbering systems). Particularly important here is section 11 of the Act, which gives certain fire protection districts, including the defendant-appellant, "the express power to adopt and enforce fire prevention codes and standards parallel to national standards." 70 ILCS 705/11.

### B. *Fire Alarm Technology and the 2009 Ordinance*

A fire alarm system consists of three basic parts: (1) smoke and heat detectors; (2) an alarm panel in the protected building that receives signals from those detectors; and (3) a communication device that transmits the signals to a receiver "board" at a central location for dispatch of firefighting personnel and equipment. These signals may be transmitted either through telephone wires or by wireless radio technology. Prior to 2009, most

of the plaintiff alarm companies operated systems that communicated, whether by wireless radio or by telephone wire, with central monitoring stations operated by the private companies themselves. In fire alarm industry lingo, this type of system is known as a "central station service" system. When a private alarm company's central station receives an alarm or trouble signal, the company then relays that signal to the appropriate local dispatching agency.

Plaintiff ADT Security Services has a different system. An earlier ordinance adopted by the District prohibited central station monitoring if the central station was outside a specified four-county area in the Chicago area. Unlike the other plaintiffs, ADT is not based in Illinois and has no central stations located within the state. It therefore provided for communication through dedicated telephone lines connected directly to an alarm board maintained at the District, which then forwarded the signals to the District's local dispatching agency, which is known as Du-Comm (a portmanteau for DuPage Public Safety Communications).

The District became dissatisfied with ADT's telephone-based system, and on review of summary judgment, we treat as true the District's claim that it was concerned about safety and efficiency. In 2007, the District began to study the feasibility of implementing a uniform wireless radio network and concluded that such a system would be advantageous. The District solicited bids from six fire alarm companies, including plaintiffs ADT and Alarm Detection Systems, Inc. (ADS). In their

bids, ADT and ADS proposed central station service systems, that is, ones in which signals would be sent to their own central stations rather than directly to the District. Two other vendors — Fox Valley Fire and Safety and Chicago Metropolitan Fire Prevention Company (Chicago Metro) — each proposed setting up a single wireless alarm monitoring network in which the District itself would own and operate its own supervising station, and all customers' alarm signal transmitters would communicate directly with the District's board there. In other words, Fox Valley and Chicago Metro proposed cutting out the middlemen of multiple alarm companies' central stations. In the fire alarm industry, this arrangement where the government agency's station is the nerve-center is called a "remote super-vising station" system. The District determined that this was the superior model and eventually selected Chicago Metro as the winning bidder.

The District adopted the 2009 ordinance requiring all commercial properties and multi-family residences to join the District's new wireless monitoring network. See Lisle-Woodridge Fire Protection District, Ill., Ordinance 09-06 §§ 1.3, 1.6 (Sept. 22, 2009) (the Ordinance). The Ordinance noted that the District had already entered into a contract with Chicago Metro "for the purpose of providing and maintaining a state-of-the-art wireless radio monitoring system that will transmit alarm and trouble signals to the District's communications center via a Keltron radio transmitter." *Id.* at 2. In the contract with Chicago Metro, the District agreed to require all current and future subscribers to "direct-connect" so that all alarm and trouble signals would be communicated

directly to the District's communications center via one particular type of equipment, the Keltron radio transmitter. The Ordinance accordingly provided: "The method of connecting directly to the remote supervising station shall be by the LWFPD Keltron Wireless Alarm Network, or other alternate connection means as approved by the Fire Prevention Chief." *Id.* § 1.6.

This direct-connect requirement imposed a substantial change on customers whose alarms are connected to the central stations of the plaintiff private alarm companies. The Ordinance provided that such subscribers would be "provided with a radio transceiver that replaces their current monitoring connection arrangement to the remote supervising station." *Id.* § 1.3. The District would be "the owner of all equipment associated with the LWFPD Keltron Wireless Alarm Network." *Id.* The Ordinance also required all subscribers to sign up for five-year "leasing" contracts for use of the equipment and to pay monitoring fees to the District. *Id.* § 1.8. "The installation and the annual and necessary maintenance . . . of the radio transceiver at the subscriber's premise will be completed *solely* by a fire alarm company of the [District's] choice," namely Chicago Metro. *Id.* § 1.4 (emphasis added). The chosen contractor would thus be the exclusive provider of the transmitter technology, but not of the other parts of the alarm system — i.e., the smoke and heat detectors that trigger alarm signals — which property owners remained responsible for having installed, maintained, and tested. See *id.* § 1.5.

As its statutory authority under the Act, the Ordinance relied primarily on the power of fire protection districts under section 11 to adopt fire prevention standards that are parallel to national standards. See *id.* at 2. The Ordinance included a severability clause in case any portion might be held invalid. See *id.* § 3.

In December 2009, after adoption of the Ordinance, the District sent a letter to owners of all commercial and multi-family residential properties in the District. The letter announced the new system and its associated monitoring fee of $66 per customer per month. The most provocative part of the letter said: "If you are under contract for monitoring with another vendor, our ordinance now supersedes those contracts and makes them null and void." To the alarm companies already providing fire-alarm monitoring services to these customers under long-term contracts, this was an invitation to file this lawsuit.

D.  *District Court Proceedings*

The District's system through Chicago Metro became fully operational in May 2010, and at that time, the plaintiff alarm companies lost many of their customers in the District's territory. The private alarm companies filed suit in July 2010 alleging that the Ordinance violated federal antitrust laws and the Due Process, Equal Protection, and Contracts Clauses of the United States Constitution, and was not authorized by Illinois law. The district court has federal question jurisdiction over the antitrust and constitutional claims pursuant to 28 U.S.C. § 1331 and has exercised supplemental juris-

diction under 28 U.S.C. § 1367 over the state-law claim. The district court issued a preliminary injunction, ruling that the District did not have the legal authority under Illinois law to require commercial accounts to comply with the Ordinance. While appeals from that injunction were pending, the district court granted summary judgment and issued a permanent injunction. *ADT Security Services*, 799 F. Supp. 2d 880. That effectively mooted the already-briefed first appeals, and we expedited this appeal of the permanent injunction.

We heard oral argument on November 17, 2011, and issued an interim order staying in part the decision of the district court. We issued a clarification of the interim order on December 19, 2011. We now find that the district court erred in part in its interpretation of Illinois law to the extent it enjoined the District's direct-connect and wireless requirements, so we reverse those portions of the injunction. We affirm the district court's finding that the District could not require all commercial and multi-family buildings to use the District and its one chosen private vendor for fire alarm equipment and services, and we reject without further comment the District's numerous other claims of error. We remand for further proceeding on the remaining claims.

II. *The District's Powers Under Illinois Law*

We review de novo the district court's decision to grant summary judgment. *E.g.*, *Collins v. Hamilton*, 349 F.3d 371, 374 (7th Cir. 2003). Where a permanent injunc-

tion has been issued based on a grant of summary judgment, we must determine whether the plaintiff has shown: "(1) success, as opposed to a likelihood of success, on the merits; (2) irreparable harm; (3) that the benefits of granting the injunction outweigh the injury to the defendant; and, (4) that the public interest will not be harmed by the relief requested." *Id.* The crucial factor in this appeal is plaintiffs' success on the merits, and this factor depends on three questions of statutory interpretation: whether the District has the authority under the Act to require (1) that fire alarm systems in the district direct-connect to a central monitoring facility operated by the District or its authorized agent; (2) that such connections be established by wireless radio technology; and (3) that all account holders rely exclusively on the District and its chosen vendor for providing alarm equipment and monitoring services.

These questions are ones of first impression. Our duty is to interpret the Act as best we predict the Illinois Supreme Court would. See *Woidtke v. St. Clair County*, 335 F.3d 558, 562 (7th Cir. 2003); *Allstate Ins. Co. v. Menards, Inc.*, 285 F.3d 630, 637 (7th Cir. 2002). In the absence of guiding decisions by the state's highest court, we consult and follow the decisions of intermediate appellate courts unless there is a convincing reason to predict the state's highest court would disagree. See *Fidelity Union Trust Co. v. Field*, 311 U.S. 169, 177-78 (1940) ("An intermediate state court in declaring and applying the state law is acting as an organ of the State and its determination, in the absence of more convincing evidence of what the state law is, should be followed by

a federal court in deciding a state question."); *Klunk v. County of St. Joseph*, 170 F.3d 772, 777 (7th Cir. 1999) ("To the extent that the state's highest court has not addressed an issue, we examine the decisions of the lower state courts.").

In Illinois, the "only units of local government that may exercise home rule powers are counties and munici-palities." *Dineen v. City of Chicago*, 531 N.E.2d 347, 349 (Ill. 1988), citing Ill. Const. art. VII, § 6(a). Since "a fire protection district is neither a county nor a mu-nicipality, . . . it cannot have home rule powers." *Id.* at 349-50. "Fire protection districts . . . derive their existence and all their powers from the legislature." *Glenview Rural Fire Protection Dist. v. Raymond*, 311 N.E.2d 302, 304 (Ill. App. 1974). They "possess no inherent powers and must be able to point out the statute which authorizes their acts." *Id.*, citing *City of Chicago v. Arbuckle Bros.*, 176 N.E. 761 (Ill. 1931). Where such authorizing language is invoked, it is "strictly construed and any fair or rea-sonable doubt that an asserted power exists is resolved against [the fire protection district]." *Id.*

In this case, the District has identified three sections of the Act — sections 1, 6, and 11 — to support its assertion of power in the Ordinance. We can dispense quickly with sections 1 and 6, and then turn to the main issue, the scope of section 11.

We agree with the district court and the Illinois Appel-late Court that section 1 provides a broad statement of general purpose that does not itself confer any powers on fire protection districts. The specific grants of power are in many later sections, which would all be superfluous

if we read section 1 as broadly as the District proposes. See *ADT*, 799 F. Supp. 2d at 884; *Glenview*, 311 N.E.2d at 305; see also *Wilkes v. Deerfield-Bannockburn Fire Protection Dist.*, 399 N.E.2d 617, 623 (Ill. App. 1979). On its own, section 1 does not provide the District with the authority to regulate fire alarm systems.

The District also relies on two subsections of section 6, which grants powers to fire districts' boards of trustees. Subsection 6(d) gives a fire protection district the power to buy real estate and personal property with installment contracts lasting up to 25 years. Subsection 6(i) gives a district's board the administrative powers necessary to conduct the board's own business. Neither provision broadens the services the District may provide or authorizes the District to take over the fire alarm business within its boundaries. See generally *Gaffney v. Board of Trustees of Orland Fire Protection Dist.*, 921 N.E.2d 778, 785 (Ill. App. 2009) (subsection 6(i) does not permit the board to "impose any substantive requirements" for health insurance eligibility that are not otherwise set forth in the statute).[1]

---

[1] The District also makes a one-sentence throwaway argument that section 10a empowers it to establish its own fire alarm network because that section "provides a fire protection district the authority to 'sell, lease, or exchange personalty.'" Appellant's Br. at 15, quoting 70 ILCS 705/10a. That quotation is misleading because it omits without notation the remainder of the sentence. The full sentence reads: "The board of trustees of any fire protection district incorporated under this Act may

(continued...)

With those preliminaries out of the way, we turn to the main event, the scope of section 11 of the Act, which grants substantive powers to fire protection districts. We conclude that those powers are not so broad as to enable the District to establish a monopoly over alarm transmitters and monitoring services, but they do authorize the District to require buildings to be equipped with wireless alarm signaling devices that communicate directly with the District's board.

Section 11 provides in relevant part:

> The board of trustees of any fire protection district incorporated under this Act has the power and it is its legal duty and obligation to provide as nearly adequate protection from fire for all persons and property within the said district as possible and to prescribe necessary regulations for the prevention and control of fire therein. The board of trustees may provide and maintain life saving and rescue equipment, services and facilities, including an emergency ambulance service. . . . [With exceptions not applicable here] the board of trustees has the

---

[1] (...continued) sell, lease or exchange personalty and may sell or lease realty owned by the district *and no longer needed for fire protection purposes.*" 70 ILCS 705/10a (emphasis added). This provision concerns *surplus* property that a fire district wishes to convey or lease to others, rather than property it seeks to acquire. The district court rightly characterized the District's reliance on section 10a as "absurd" and "grasping at straws."

> express power to adopt and enforce fire prevention
> codes and standards parallel to national standards.

70 ILCS 705/11.[2] Whether section 11 authorizes the new
regulations imposed by the District's Ordinance depends
on whether the new requirements can be considered
"parallel to national standards." *Id.* We focus on the
Ordinance's three distinct changes to the legal regime
governing fire alarm systems in the District. First, it
requires commercial and multi-family buildings to have
alarm systems that communicate directly with the Dis-

---

[2] The current language in this section is the product of an
extended dialogue between the Illinois Appellate Court and the
Illinois legislature. In 1979, *Wilkes* held that section 11 did not
allow a fire protection district to operate emergency ambulance
services as a form of "life saving and rescue . . . services." 399
N.E.2d at 620. The legislature then amended section 11 to
authorize emergency ambulance services. Pub. Act 81-1375,
§ 1, effective Aug. 9, 1980 (codified as amended at 70 ILCS
705/11). Six years earlier, in 1974, the *Glenview* court had
invalidated a fire protection district ordinance requiring the
installation of sprinkler systems. 311 N.E.2d at 304-06. The
legislature likewise responded by amending what is now
section 11 to give districts the "express power to adopt and
enforce fire prevention codes and standards parallel to
national standards." Pub. Act 80-453, § 1, effective Oct. 1, 1977
(codified as amended at 70 ILCS 705/11). The Illinois
Appellate Court later confirmed that this "national standards"
amendment authorized fire protection districts to require
building owners to install sprinkler systems. See *Orland
Fire Protection Dist. v. Intrastate Piping & Controls, Inc.*, 637
N.E.2d 641, 646 (Ill. App. 1994).

trict's monitoring board (the direct-connect require-ment). Second, it requires that such connections be via wireless radio communication (the wireless require-ment). Third, it requires all affected property owners to lease signaling devices from the District and to con-tract with the District for the installation, service, and maintenance of these devices (the exclusive provider requirement). We examine each requirement separately to determine whether it is parallel to national standards.

A. *The Direct-Connect Requirement*

As both sides acknowledge, the model fire codes issued by the National Fire Protection Association (NFPA) supply the prevailing national standards for purposes of section 11. The applicable NFPA code on alarm signaling, *NFPA 72*, establishes that a fire protection agency may designate any of three different types of supervisory entities to receive transmission signals from fire alarm devices: (1) the "central stations" of private alarm companies (like plaintiffs in this case); (2) a "remote supervising station" operated by a governmental agency (like the District's preferred system); or (3) "proprietary supervising stations" (stations operated by the building owners themselves — an alternative that is not at issue in this case). See *NFPA 72: National Fire Alarm and Signaling Code* §§ 26.1, 26.3-26.5 (2010 ed.) (hereinafter "*NFPA 72*"); see also *Alarm Detection Systems, Inc. v. Village of Hinsdale*, 761 N.E.2d 782, 786 (Ill. App. 2001) ("Pursuant to NFPA 72, all commercial structures that are required

to have an automatic fire alarm system must be monitored by either a central monitoring station or a remote station (*e.g.,* a municipal fire board)."), citing *NFPA 72: National Fire Alarm Code* § 5-4.1 (1999 ed.).[3]

Where a government agency like the District elects option (2) and uses its own fire board, the NFPA code provides: "Alarm, supervisory, and trouble signals shall be permitted to be received at" any one of three locations: "a communications center that complies with . . . [NFPA] requirements," "at the fire station," "or at the governmental agency that has public responsibility for taking prescribed action to ensure response upon receipt of a alarm [sic] signal." *NFPA 72* §§ 26.5.3.1.1-2. Finally, "[w]here permitted by the authority having jurisdiction,

---

[3] *NFPA 72* defines "Central Station Service Alarm System" as: "A system or group of systems in which the operations of circuits and devices are transmitted automatically to . . . a . . . central station . . . operated by a person, firm, or corporation whose business is the furnishing, maintaining, or monitoring of supervised alarm systems." *NFPA 72* § 3.3.267.1. The code defines "Proprietary Supervising Station" as: "A supervising station under the same ownership as the protected premises fire alarm system(s) that it supervises (monitors)." *Id*. § 3.3.266.2. The code defines "Remote Supervising Station Alarm System" as: "a protected premises fire alarm system . . . in which alarm, supervisory, or trouble signals are transmitted automatically to . . . and supervised from a remote supervising station that has competent and experienced servers and operators who, upon receipt of a signal, take such action as required by this Code." *Id.* § 3.3.267.3.

alarm, supervisory, and trouble signals shall be permitted to be received at an alternate location approved by the authority having jurisdiction." *Id.* § 26.5.3.1.3. In other words, the relevant national standards are consistent with either a system using multiple central stations or a system built around a single remote board.

In passing the disputed Ordinance, the defendant District opted for the latter system — the "remote supervising station" system authorized by *NFPA 72* § 26.5.3.1.2. Because this reflects one scheme that the NFPA has expressly approved, we conclude that the District's direct-connect requirement is parallel to national standards. The alarm companies' contention that the District must allow each and every supervisory signaling system allowed by *NFPA 72* is both impractical and at odds with the meaning of the word "parallel." In ordinary (non-geometric) parlance, "parallel" means comparable to and consistent with, but not necessarily "identical." One thing is parallel to another when it is "marked by a likeness or correspondence" or when there is "agreement in many or all essential details." *Webster's Third New International Dictionary of the English Language* 1637 (1993). Because the Ordinance selects among permissible alternatives by requiring alarm devices to direct-connect to the board at the District's own remote supervising station, it corresponds to and is therefore parallel to national standards.

The plaintiff alarm companies contend that because the NFPA standards also allow for their central stations, as well as just one board operated by the District, section 11 does not permit the District to impose the stricter re-

quirement of direct connection to its own board. As we understand their argument, plaintiffs contend that section 11 makes the NFPA standards both the floor and the ceiling for requirements that the District may impose. We do not interpret the "parallel to national standards" language so narrowly. Section 11 allows an Illinois fire protection district to use the NFPA standards as a floor and to require similar but parallel and somewhat more demanding requirements. Such experimentation may be helpful in improving fire protection for the long term, and we do not read section 11 as prohibiting it. We therefore conclude that a fire district, like a non-home-rule municipal corporation, may mandate a remote supervising system that requires direct connection to the district's own remote supervising station's fire alarm board.

This result is in harmony with the Illinois Appellate Court's conclusion that a non-home-rule *municipality* has the authority to "require[ ] all owners of commercial buildings to connect their fire alarm systems directly to the Village's fire board for monitoring." *Alarm Detection Systems, Inc. v. Village of Hinsdale*, 761 N.E.2d 782, 785 (Ill. App. 2001). Of course, municipal corporations derive their legal authority to regulate fire protection from a different statute than fire protection districts do. See Illinois Municipal Code, 65 ILCS 5/11-6-1; *Hinsdale*, 761 N.E. 2d at 790 ("Fire protection districts are not governed by the provisions of the [Illinois Municipal] Code and are completely separate legal entities from municipalities."). Like fire protection districts, however, non-home-rule municipalities possess only those powers

established by statute. See Ill. Const. 1970, art. VII, § 7; *Glenview*, 311 N.E.2d at 304 ("Fire protection districts, *like all municipal corporations*, derive their existence and all their powers from the legislature.") (emphasis added). Moreover, the *Hinsdale* court considered the village's own direct-connect ordinance in the context of *NFPA 72*, just as we do here, and likewise read *NFPA 72* to "authorize fire alarm monitoring by either a central station or a fire board." *Hinsdale*, 761 N.E.2d at 788. Like the District in our case, the Village of Hinsdale opted for the latter, and the requirement was upheld.[4]

B.  *The Wireless Requirement*

The Ordinance's requirement that alarm devices communicate with the District's board via wireless radio technology is also parallel to national standards. *NFPA 72* provides: "Alarm system equipment and installations

---

[4]  The major difference in *Hinsdale* was that the court ultimately concluded that because a municipality had the statutory authority "to amend national building or fire codes or draft its own codes as it determines is necessary in order to protect the public safety and welfare," it was not limited to "enacting only those rules and regulations promulgated by nationally recognized trade associations." *Id.* at 789. The state court thus upheld the ordinance in its entirety without examining its consistency with national standards. Fire districts, in our reading of the Illinois law, do not get such wide latitude. Their rules must "parallel" national standards, but the direct-connect requirement does so.

shall comply with Federal Communications Commission (FCC) rules and regulations, as applicable, concerning the following: (1) Electromagnetic radiation[;] (2) *Use of radio frequencies*[;] (3) Connection to the public switched *telephone network* of telephone equipment, systems, and protection apparatus." *NFPA 72* § 26.6.2.4.1 (emphases added). The code further specifies: "Where *only one communications technology is used*, any failure of the communications path shall be annunciated at the supervising station within 5 minutes of the failure." *Id.* § 26.6.3.1.4.1 (emphasis added). The applicable NFPA code thus identifies wireless radio technology as one permissible communications method in fire alarm signaling devices and provides further that a system may be limited to "only one communications technology" for any one supervising station. *Id.* The District's selection of wireless radio frequency as an exclusive form of communications technology is consistent with and therefore "parallel" to these standards.

C.  *The Exclusive Provider Requirement*

The more dramatic effect of the challenged Ordinance was to make the District, together with its private partner Chicago Metro, the exclusive provider and servicer of the necessary equipment. The District has identified no provision in *NFPA 72* that authorizes such an arrangement, nor have we found one. On the contrary, in its definition of "Remote Supervising Station Service" (the direct-connect system), *NFPA 72* states: "Related activities at the protected premises, such as equipment

installation, inspection, testing, and maintenance, are the *responsibility of the owner*" of the premises. *NFPA 72* § 3.3.268.3 (emphasis added). The District, by making itself the sole purveyor, installer, inspector, tester, and maintainer of the necessary radio transmitter equipment, has usurped responsibilities the NFPA code accords to property owners. Although *NFPA 72* authorizes a fire protection agency like the District to control the *receiver* end of the alarm signaling infrastructure — that is, by owning and operating a remote supervising station — it does not authorize the takeover of the transmitter end, as well. The District's requirement to that effect cannot be said to "parallel" any national standard of fire protection services and is consequently not authorized under section 11 of the Act.

Neither the NFPA code nor the Act even tacitly endorses so drastic a policy change as the establishment of a local governmental monopoly over fire alarm transmitter devices. In view of fire protection districts' limited powers, supplanting a competitive private market is far too significant a change to infer from statutory silence. We agree with the district court that the District exceeded its authority under Illinois law in enacting the Ordinance's exclusive provider requirement, which is therefore null and void. The Ordinance's severability clause allows this provision to be invalidated without condemning the entirety of the legislation. Because the direct-connect and wireless requirements are permissible exercises of the District's powers under section 11 of the Act, these provisions survive review, and the district court erred by striking them down as *ultra vires* acts.

III. *Instructions on Remand*

We recognize that the district court will continue to face a number of additional claims and challenging issues after remand. To help guide the district court's resolution of these issues, some of which have been identified in the parties supplemental motions memoranda to this court, we briefly address two, and in all other respects deny the parties' supplemental motions.

A. *Effective Monopoly*

The plaintiff alarm companies contend that if the District is able to require direct connection to its own board, it will "effectively perpetuate a monopoly over alarm monitoring that displaces competition" — presumably by setting restrictive technical specifications to enable compatibility with its board. (According to the alarm companies, only one manufacturer's transmitter is currently compatible.) Appellees' Motion for Clarification, Dkt. No. 46-1, at 4-5. We acknowledge that this is a possibility. With the District providing its own central station and dispatch services, it remains to be seen what marginal value private alarm companies could offer potential customers by providing and servicing their own wireless transmitters. The benefits of bundled alarm services — combining fire, burglar, and other services into one transmitting unit and one contract — might be attractive to some customers. We also note that the plaintiffs' brief to this court in the appeals from the preliminary injunction (Nos. 10-3754 and 10-3968) seemed to acknowledge that a direct-

connect wireless system would be feasible. Among the hypothetical systems the alarm companies proposed as alternatives to a District monopoly, the alarm companies described scenarios quite close to the arrangement our decision today envisages:

> There were obvious ways to address the purported goal of better fire alarm monitoring without even considering taking over the Business. The District could have . . . (3) required that all such Commercial Accounts switch to radio or other acceptable technology; (4) replaced the ADT board [located at Du-Comm] with a board that could receive wireless and let those affected Commercial Accounts migrate to wireless; (5) accepted [plaintiff] ADS's proposal to operate a new board to serve those Commercial Accounts on the old board at no cost to the District.

Brief of Appellees at 19, ADT Security Services, Inc. v. Lisle-Woodridge Fire Protection Dist., Nos. 10-3754 and 10-3968 (7th Cir. June 14, 2011). These alternatives suggest that the plaintiff alarm companies did not anticipate that a system in which all transmitters communicated wirelessly with a single supervising station would entirely displace the competitive market.

We also note that section 1.6 of the Ordinance gave the District's fire prevention chief the authority to approve alternate means of connecting directly to the District's network. This flexibility seems to us an essential part of the Ordinance. If competing equipment suppliers provide truly compatible alternatives, the District would not have statutory authority or reason to prohibit such alternatives.

For its part, the District insists that "each alarm company would be able to connect directly to the District's board . . . with their company-owned radios, which are linked to their customers' alarm panels" and "compete on an equal playing field," with "no alarm company . . . at a competitive disadvantage." Appellees' Response to Motion for Clarification, Dkt. No. 53, at 2-3. We acknowledge the disagreement and will not speculate further on the matter. Although resolution of the question would not change the analysis of the District's authority under the Act, it may affect the legality of its planned system under state and federal antitrust laws. We leave it to the district court to address the problem in the first instance.

B. *Fees*

On a related issue, the parties have also disputed whether the District has the authority to charge fees to the alarm companies for the privilege of connecting to the District's board. The alarm companies contend that this power would also enable the District to establish an effective monopoly by charging enough either to force the private companies to raise their rates to customers, thus rendering them uncompetitive, or to increase the private companies' costs to the point they are induced to exit the market. On this point, we agree that this would be the likely result of allowing the District to charge fees to alarm companies for direct-connect access to its board. In any event, we do not think the Act permits the District to impose such fees to the

alarm companies for services provided on behalf of District residents. Section 11f provides:

(a) The board of trustees of a fire protection district may fix, charge, and collect fees not exceeding the reasonable cost of the service for all services rendered by the district against persons, businesses and other entities who are not residents of the fire protection district.

(b) Such charge may not be assessed against residents of the fire protection district or persons who request fire protection coverage for an unprotected area and who pay to the fire protection district an amount equal to the district's Fire Protection Tax pursuant to Section 4 of the Fire Protection of Unprotected Area Act.

70 ILCS 705/11f(a)-(b). The District points out that subsection 11f(a) allows it to charge "fees not exceeding the reasonable cost of . . . services rendered" to "businesses" that are not residents. The language in subsection 11f(b), however, clearly indicates that the type of "services" referred to are limited to those involving "coverage for an unprotected area." Together, these subsections allow a fire protection district to charge a fee to provide fire protection services to persons or businesses outside its (tax-paying) jurisdiction, but prohibit the district from imposing fees on outsiders for services it provides to tax-paying insiders in the ordinary course of fire protection. Charging the alarm companies for the right to connect to the District's board would not facilitate the extension of fire protection coverage to non-residents, so in our

view such a fee would not be permitted under subsection 11f(a).[5]

### C.  Timing

Finally, our interim order stayed the district court's permanent injunction until March 15, 2012. Our interim order is extended to 28 days after issuance of this opinion.

### IV.  Conclusion

The judgment of the District Court is AFFIRMED in part and REVERSED in part, and the case is REMANDED for further proceedings consistent with this opinion.

---

[5] We express no view on whether this provision prohibits the District from imposing the $66 "monitoring fee" on *residents* for use and maintenance of its alarm signaling equipment. The alarm companies have not specifically challenged this provision of the Ordinance, so we need not address this question here.