In the

# United States Court of Appeals
### For the Seventh Circuit

---

No. 21-2447

PATRICK B. CAGE,

*Plaintiff-Appellant*,

*v.*

TIFFANY HARPER, *et al.*,

*Defendants-Appellees*.

---

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 17-cv-07621 — **Steven Charles Seeger**, *Judge*.

---

ARGUED APRIL 7, 2022 — DECIDED AUGUST 1, 2022

---

Before RIPPLE and SCUDDER, *Circuit Judges.*[*]

SCUDDER, *Circuit Judge*. In May 2017 Chicago State University fired its General Counsel, Patrick Cage. Litigation followed, with Cage alleging that the decision violated both the Illinois Ethics Act and the First Amendment by reflecting

---

[*]Circuit Judge Kanne died on June 16, 2022, and did not participate in the decision of this case, which is being resolved under 28 U.S.C. § 46(d) by a quorum of the panel.

retaliation for his having blown the whistle on a potential conflict of interest that arose when the Board of Trustees began its search for a new University president. Cage likewise contended that the University violated his due process rights by shorting him two months of severance pay. The district court entered summary judgment for the University defendants. Seeing no errors in that decision, we affirm.

## I

### A

Patrick Cage served as the University's General Counsel from November 2009 until May 2017. Upon joining the University, he negotiated the terms and conditions of his employment in an offer letter, which he signed upon accepting the position. Everyone agrees that the signed offer letter constitutes Cage's employment agreement with the University.

The events that led to this litigation began in January 2017, when Illinois Governor Bruce Rauner appointed four new members to the University's Board. Paul Vallas was one of the new members. A month later Cage learned from media reports that Vallas had an interest in serving as the University's next president, a position that became available after the previous president resigned in September 2016. Cage believed that this news, if true, would present a conflict of interest under the Board's Bylaws: Vallas could not serve on the Board while seeking employment with the University. Cage knew that no steps had yet been taken to address the potential conflict.

Cage sought to raise his concern by requesting a meeting with the Board's Chairman, Dr. Marshall Hatch. The two met for lunch in February 2017. Cage says he discussed the

potential conflict with Dr. Hatch. For his part, however, Dr. Hatch has no recollection of any such discussion.

In March 2017 the Board began searching for an interim president. One potential candidate the Board contacted was Dr. Rachel Lindsey. During a Board meeting on March 27, the Board agreed to select a new interim president at its next meeting on April 7. According to the meeting minutes, the Board discussed whether it could consider Vallas for the position given that he was a sitting Board member. The discussion concluded with the Board members believing they could consider Vallas so long as he resigned from the Board. Vallas left the Board the following week.

On the evening of April 6—the day before the meeting at which the Board planned to decide on an interim president—Cage sent a letter to each member renewing his concern that Vallas had violated the University's Bylaws by simultaneously serving on the Board and seeking employment with the University. The April 7 meeting ended with the Board selecting Dr. Lindsey as its interim president.

Six weeks later, on May 22, Dr. Lindsey fired Cage, concluding he was no longer the right person for the position. In doing so, the University offered Cage a severance package, including pay equivalent to 44 weeks (just over 10 months) at his current salary. Cage refused the offer, believing that his employment agreement afforded him a full year of severance pay.

By its terms, the employment agreement states that the "Chicago State University Board of Trustees Policies and Regulations Manual and the Chicago State University Administrative Procedures Manual govern [Cage's] employment

contract" and that Cage's "appointment is guided by the Board of Trustees regulations." The agreement is otherwise short on details but includes a termination clause specifying that "[i]f you are terminated from this position, or the funding supporting this position is not renewed, you will remain employed at the University for a period of six months at your current salary." The University Regulations, by contrast, have their own provision regarding the rights of terminated employees. Specifically, Section II(B)(4)(b) of the Regulations provides that employees who have worked for the University for at least six years will receive 12 months' notice of termination.

B

On October 20, 2017, Cage invoked 42 U.S.C. § 1983 and sued Dr. Lindsey, the Board of Trustees, and five individual Board members. He alleged that the University fired him in retaliation for reporting the potential conflict of interest in violation of Illinois's State Officials and Employees Ethics Act and the First Amendment. He also claimed the University violated the Fourteenth Amendment's Due Process Clause by not paying him the 12 months of severance pay allegedly promised by the Board's Regulations.

The district court entered summary judgment for the defendants across the board. It concluded that Cage's employment agreement governed the terms of his employment and only entitled him to six months of severance pay. The district court also determined that Cage could not succeed on his retaliation claims because his primary allegations about Paul Vallas laboring under a conflict of interest fell outside the coverage of the Illinois Ethics Act and the First Amendment.

Cage now appeals.

## II

Summary judgment is proper if the defendants show that no material facts are genuinely disputed and that they are entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a). Our role is to take an independent look at the summary judgment record to determine whether, drawing every inference in Cage's favor, the defendants have done so here. See *id.*; see also *Flexible Steel Lacing Co. v. Conveyor Accessories, Inc.*, 955 F.3d 632, 643 (7th Cir. 2020).

## A

The Fourteenth Amendment promises that "[n]o state shall … deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. To succeed on a due process claim, Cage must demonstrate "(1) that he had a constitutionally protected property interest, (2) that he suffered a loss of that interest amounting to a deprivation, and (3) that the deprivation occurred without due process of law." *Moss v. Martin*, 473 F.3d 694, 700 (7th Cir. 2007).

The district court saw Cage's claim as deficient on the first prong—he lacked a property interest protected by the Constitution in twelve months' severance pay from the University. We agree. Property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). That law can include state contract law. See *Moss*, 473 F.3d at 700. And, as the parties acknowledge, the state law in question is Illinois law. See *Cromwell v. City of Momence*, 713 F.3d 361, 363–64 (7th Cir. 2013).

By its terms, Cage's employment agreement entitled him to six months' pay upon separating from the University. For their part, the Board's Regulations state that an employee of Cage's seniority shall receive 12 months' notice of termination and, by extension, 12 months of severance pay upon being fired without advance notice. But Cage's employment agreement did not incorporate by reference the Regulations' termination provision, and it was that reality that led the district court to conclude that the University owed Cage only six months of severance pay.

Under Illinois law, a contract may incorporate by reference all or part of another document if it "show[s] an intention to incorporate the document and make it part of the contract." *188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 736 (7th Cir. 2002) (quoting *Wilson v. Wilson*, 577 N.E.2d 1323, 1329 (Ill. App. Ct. 1991)). The burden is on the "party seeking to enforce the terms of an allegedly incorporated document" to show "'an intention to incorporate the document and make it a part of the contract.'" *Id.* at 736–37 (quoting *Arneson v. Bd. of Trustees, McKendree Coll.*, 569 N.E.2d 252, 256 (Ill. App. Ct. 1991)). That intention must be "clear and specific." *Id.* at 736.

Cage's employment agreement included both an express six-month severance term and a provision stating that the Regulations "govern" the agreement. Cage urges us to read the latter provision as trumping the former. We cannot do so, as that reading is inconsistent with the agreement's clear and precise language. We see the specific six-month provision as defining what the parties agreed to—a provision that supplants the more general reference to the Regulations. We know of no other way to make sense of the parties' express agreement to a six-month term of severance pay—a provision

that stands in stark contrast to other portions of the agreement that omit specific terms and conditions and instead more generally incorporate the Board's Regulations by stating that Cage will receive the same fringe benefits as every other administrative employee.

That the Regulations "govern" Cage's employment agreement does not change our conclusion. The Regulations do govern (by defining the terms and conditions of a particular benefit) where the employment agreement is silent and, unlike the approach the parties took with severance pay, omits a specific provision on the amount or duration of the benefit in question. This observation reflects the black letter principle of reading contracts to avoid interpretations that render express terms superfluous. See *Evans v. Lima Flight Team, Inc.*, 869 N.E.2d 195, 201 (Ill. App. Ct. 2007) (rejecting an interpretation that "would render [a] phrase … superfluous" because "[c]ontractual terms should be construed so as to avoid the conclusion that other terms are redundant").

Nothing prevented the parties from expressly incorporating the 12-month severance period from the Regulations. And, as we recently observed, "Illinois law imposes a strong presumption against provisions that easily could have been included in the contract but were not." *Holmes v. Godinez*, 991 F.3d 775, 780 (7th Cir. 2021) (cleaned up). Put most simply, Cage is bound by what he and the University negotiated and then expressly included in his employment agreement—a six-month severance pay period. This provision benefited Cage early in his tenure at the University by guaranteeing him three more months of severance pay than the Regulations otherwise would have provided during his first and second years of employment. And, conversely, the six months benefited the

University by lowering the amount it would have to pay Cage upon termination later in his tenure.

Holding the parties to the bargain they struck, Cage had no property interest in twelve months of severance pay. The district court was right to reach this same conclusion in entering judgment for the University defendants on Cage's due process claim.

B

This brings us to Cage's claim under the State Officials and Employees Ethics Act. The Ethics Act protects whistleblowers by prohibiting retaliation against a state employee after he "[d]iscloses or threatens to disclose to a supervisor or to a public body an activity, policy, or practice of any officer, member, State agency, or other State employee that the State employee *reasonably believes is in violation of a law, rule, or regulation*." 5 ILCS 430/15-10(1) (emphasis added).

Cage contends that he engaged in protected activity—reporting the alleged conflict of interest and Bylaws violation relating to Board member Paul Vallas—only then to lose his job. For Cage's concern about Vallas to fall within the coverage of the Ethics Act, he had to show that the University's Bylaws are "a law, rule, or regulation" within the meaning of the enactment. Here too we agree with the district court that he failed to do so.

Cage is not arguing that the Bylaws constitute a "law" or "regulation." For good reason. The Bylaws come from the University itself, not the Illinois General Assembly or any state regulatory department or agency. The question, then, is whether a provision in the Bylaws (here, relating to

impermissible conflicts of interest) constitutes a "rule" within the meaning of the Ethics Act.

Nowhere in the statute did the Illinois General Assembly define the term "rule." Nor has the Illinois Supreme Court interpreted the term's meaning under the Ethics Act. In these circumstances, our role is to predict how the state's highest court would answer the question presented—whether the Bylaws provision in question is a "rule." See *Cmty. Bank of Trenton v. Schnuck Mkts., Inc.*, 887 F.3d 803, 807 (7th Cir. 2018). Our analysis can and should "take into account trends in a state's intermediate appellate decisions." *Id.* at 811; see also *In re Zimmer, NexGen Knee Implant Prods. Liab. Litig.*, 884 F.3d 746, 751 (7th Cir. 2018) (recognizing that when there is no prevailing authority from the Illinois Supreme Court, we must "'consult and follow the decisions of intermediate appellate courts' to predict how the supreme court would act given the chance, unless 'there is a convincing reason to predict the state's highest court would disagree'") (quoting *ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist.*, 672 F.3d 492, 498 (7th Cir. 2012)).

The only Illinois appellate decision that has interpreted the meaning of "rule" under the Ethics Act is *Snow v. Department of Human Services*, 2019 IL App (4th) 180060-U. In *Snow*, albeit in an unpublished decision, the court interpreted "rule" within the meaning of the Ethics Act by drawing on the General Assembly's definition of the same word in the Illinois Administrative Procedure Act, which we refer to as the IAPA. See *id.* ¶ 38. Under the IAPA, a rule is an "agency statement of general applicability that implements, applies, interprets, or prescribes law or policy" and excludes "statements concerning only the internal management of an agency and not

affecting private rights or procedures available to persons or entities outside the agency." 5 ILCS 100/1-70. Applying this definition, the court in *Snow* concluded that an agency's internal parking policy was not a "rule" within the meaning of the Ethics Act. *Snow*, 2019 IL App (4th) 180060-U, at ¶ 39.

Under *Snow*'s interpretation of "rule," the University's Bylaws fall outside the coverage of the Ethics Act, as they concern matters of institutional governance and management and not the private rights of non-employees.

*Snow*'s interpretation finds structural reinforcement in the Ethics Act itself. Recall that the term "rule" sits between "law" and "regulation" in the statutory language at issue. See 5 ILCS 430/15-10(1). Both laws and regulations are the product of a formal process and carry the force of law, suggesting that a rule likewise must go through a formal (or some analogous) process and have legal effect. See *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995) ("[A] word is known by the company it keeps."); see also *United States v. Williams*, 553 U.S. 285, 294 (2008) ("[A] word is given more precise content by the neighboring words with which it is associated.").

Going further, the General Assembly's other uses of the term "rule" in the Ethics Act bolster this conclusion by often tying the word's meaning to the IAPA or formal processes. See *People v. Maggette*, 747 N.E.2d 339, 347 (Ill. 2001) ("Where a word is used in different sections of the same statute, the presumption is that the word is used with the same meaning throughout the statute, unless a contrary legislative intent is clearly expressed."). The Ethics Act, for example, created the Executive Ethics Commission and authorized the Commission to "promulgate rules," including "emergency rules under the Illinois Administrative Procedure Act." 5 ILCS 430/20-

15(1); see also *Promulgate* (3), Black's Law Dictionary (11th ed. 2019) ("*Administrative law.* (Of an administrative agency) to carry out the formal process of rulemaking by publishing the proposed regulation, inviting public comments, and approving or rejecting the proposal."). The Ethics Act also empowered the Auditor General to "adopt emergency rules under the Illinois Administrative Procedure Act." See 5 ILCS 430/30-5(b). While the statute's discussion of the Legislative Ethics Commission does not expressly invoke the IAPA, it does authorize that body to "promulgate rules" and it requires notice and an opportunity for comment before the rules go into effect. 5 ILCS 430/25-15(1). In all, this context suggests that the General Assembly used the term "rule" within the Ethics Act the same way it used the same term in the IAPA—to connote and require elements of formal rulemaking.

Cages presses a different conclusion by urging us to view "rule" in the broad way permitted by dictionary definitions of the term. Merriam-Webster's Dictionary, he tells us, defines "rule" as "a prescribed guide for conduct or action" or a "regulation or bylaw governing procedure or controlling conduct." *Rule*, Merriam-Webster's Dictionary, https://www.merriam-webster.com/dictionary/rule (last visited Aug. 1, 2022).

Cage goes too far. Under his expansive construction, the term "rule" would render other statutory terms superfluous and risk absurd results. If "rule" encompassed all directives from a state department, agency, or other institution, the terms "law" and "regulation" in the Ethics Act would serve no purpose. See *Maggette*, 747 N.E.2d at 347 (rejecting the dictionary definition of a statutory term because it was inconsistent with the statute as a whole).

Even more, Cage's preferred definition lacks a limiting principle. If "rule" covered any and all mandates, protocols, and expectations governing the conduct of state employees, the Ethics Act's whistleblower provision would apply to reports of violations of minor, even trivial, workplace rules—a result that the legislature could not have intended. See *Dynak v. Bd. of Educ. of Wood Dale Sch. Dist. 7*, 164 N.E.3d 1226, 1231 (Ill. 2020) (stating that courts "may consider the consequences that would result" from a particular interpretation, "presum[ing] that the legislature did not intend absurdity, inconvenience, or injustice"). And this lack of a limiting principle is inconsistent with how *Snow* interpreted the Ethics Act. See 2019 IL App (4th) 180060-U, ¶ 41 ("[A] policy does not trigger the protections of the Ethics Act unless that policy, or a modification to the policy, violates a law, rule, or regulation.") (internal quotations and citation omitted). Indeed, the court in *Snow* rejected the contention that an organization's internal parking policy constituted a "rule" within the meaning of the Ethics Act. See *id.* ¶ 42.

In short, the district court correctly concluded that the University Bylaws are not rules within the meaning of the Ethics Act. And because Cage's actions fell outside the statute's protections, the district court was right to enter summary judgment for the defendants.

C

We come then to Cage's First Amendment retaliation claim. To prove this claim, Cage had to show that: (1) he engaged in constitutionally protected speech; (2) he suffered a deprivation likely to deter him from exercising his First Amendment rights; and (3) his speech was a motivating factor

in his employer's adverse action against him. See *Sweet v. Town of Bargersville*, 18 F.4th 273, 277–78 (7th Cir. 2021).

We begin with a "threshold inquiry into the nature of the speech at issue" to determine whether the speech is constitutionally protected. *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2423 (2022). This question comes first because the Free Speech Clause only "protects a public employee's right to speak as a citizen addressing matters of public concern under certain circumstances." *Vose v. Kliment*, 506 F.3d 565, 569 (7th Cir. 2007). "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). The Supreme Court has held that the inquiry should be a "practical one," focusing on "the duties an employee actually is expected to perform," as opposed to strictly what is listed in his formal job description. *Id.* at 424–25.

Cage's employment agreement describes his job duties at a high level, including by establishing that he was "expected to provide counsel and advice concerning compliance with federal and state statutes and regulations, provide advice for all issues relating to civil services rules and regulations, employment law, … and monitoring and resolving disputes which may lead to litigation." As a practical matter, these duties came to include many others. Indeed, an outside consulting firm prepared an independent assessment of Cage's role in 2013 and concluded that, as the General Counsel, he was responsible for "oversee[ing] all legal matters of the University," and was not confined to the responsibilities listed in his employment agreement. The report also explained that Cage

was "involved in all major decisions made" at the University and was a "key advisor for the President of the University." Cage testified along the same lines during his deposition, stating that his "primary duty" as General Counsel was to "reduce and eliminate risk to the [U]niversity."

We have no difficulty seeing Cage's reporting of Board member Paul Vallas's potential conflict of interest as within the scope of his responsibilities as General Counsel. The University's adherence to its Bylaws generally serves to reduce the institution's legal risk. But even at a more specific level, adhering to the provisions prohibiting conflicts of interest also reduces risk because, as the district court explained, "those kinds of violations could complicate hiring decisions, create additional search costs, and result in legal consequences if there was a conflict of interest."

In these circumstances, the only reasonable conclusion is that Cage acted in furtherance of his responsibilities as the University's chief legal officer when he raised concerns about the potential conflict of interest flowing from Vallas simultaneously serving on the University's Board and seeking to become the institution's next president. All of this explains why his speech lacked protection under the First Amendment.

### III

Finally, Cage challenges the district court's denial of his request to amend his complaint. We owe some additional context around what transpired in the district court.

After the parties had completed their summary judgment briefing, but before the district court issued its decision, Cage sought permission to file a third amended complaint. His motion came more than three years after the deadline for

amendments had passed. Arguing that the defendants advanced a new argument at the summary judgment stage—that his termination rights arose out of his employment agreement, not the Regulations—Cage sought to add a due process claim based on his employment agreement. The district court concluded that there was no good cause for the late amendment and denied the motion.

We see no abuse of discretion in that ruling. District courts generally evaluate a motion for leave to amend a complaint under Federal Rule of Civil Procedure 15(a)(2), which provides that courts "should freely give leave when justice so requires." But under Rule 16, which governs scheduling orders and includes a deadline for filing amended pleadings, a "schedule may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). Given this tension, we have held that a district court may "apply the heightened good-cause standard of Rule 16(b)(4) before considering whether the requirements of Rule 15(a)(2) were satisfied." *Alioto v. Town of Lisbon*, 651 F.3d 715, 719 (7th Cir. 2011). "In making a Rule 16(b) good-cause determination, the primary consideration for district courts is the diligence of the party seeking amendment." *Id.* at 720.

The timeline here is important. Cage did not seek to add a due process claim based on his employment agreement until January 2021—nearly 32 months after the deadline to amend his pleadings had passed, more than a year after fact discovery closed in December 2019, and several months after the parties replied to eight separate summary judgment motions. Yet Cage had all the information he needed to include that claim much earlier in the litigation. Indeed, Cage—an attorney with expertise in employment law—surely knew from

the very outset of this dispute with the University that his employment agreement was highly relevant to his employment-related lawsuit. On these facts, Cage has not shown good cause to add a due process claim at this late stage of the litigation.

In any event, it would be futile to permit the amendment. See *Bethany Pharmacal Co. v. QVC, Inc.*, 241 F.3d 854, 861 (7th Cir. 2001) ("An amendment is futile if the added claim would not survive a motion for summary judgment."). Cage's employment agreement entitled him to six months' termination pay. But the University, in connection with firing Cage, offered him around ten months of separation pay. Summary judgment would therefore be proper for the defendants even if Cage were allowed to amend because "[a] job action that causes no pecuniary loss whatsoever does not implicate the Constitution." *Barrows v. Wiley*, 478 F.3d 776, 780 (7th Cir. 2007) (cleaned up). Cage cannot now be heard to complain of losing six months of termination pay when he previously declined the University's offer of ten months. On these facts, the district court did not abuse its discretion in denying Cage's motion for leave to amend.

For these reasons, the district court's entry of judgment is AFFIRMED.